# United States Court of Appeals
## For the First Circuit

No. 06-1177

TIMOTHY SULLIVAN and LAWRENCE E. DANSINGER,

Plaintiffs, Appellees,

v.

CITY OF AUGUSTA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Stephen E.F. Langsdorf with whom Sigmund D. Schutz and Preti, Flaherty, Beliveau & Pachios, LLP were on brief for appellant.
David G. Webbert with whom Johnson & Webbert, LLP was on brief for appellees.

December 14, 2007

**CAMPBELL, <u>Senior Circuit Judge</u>**. Defendant-appellant City of Augusta, Maine ("Augusta" or "the City") appeals from the judgment entered in favor of plaintiff-appellees Timothy Sullivan and Lawrence E. Dansinger in the United States District Court for the District of Maine. The court found that several provisions of the City's parade ordinance and of its mass outdoor gathering ordinance (the MOGO) violated the First Amendment.

On appeal, the City challenges the standing of the plaintiffs and the ripeness of their claims, especially their right to protest the MOGO. The City also challenges the district court's rulings that provisions of both ordinances violate the Federal Constitution. We conclude the plaintiffs did not have standing to sue regarding the MOGO's alleged defects, hence we vacate all the rulings of the district court regarding the constitutionality of that ordinance's provisions. We affirm the court's rulings that the advance notice and in-person meeting requirements of the parade ordinance are constitutionally defective and affirm the district court's ruling that the $478.55 overcharge to Sullivan was unconstitutional. However, we reverse its rulings that the fee provision grants excessive discretion to the police and that the parade permit fee of $100 and associated charges for police traffic control are unconstitutional insofar as indigents must pay them without being given an opportunity to seek and secure a waiver on account of their indigency.

## Background

On February 9, 2004, acting on behalf of a group known as the March for Truth Coalition, which advocates the "worldwide end of war and empire-building" and major social and economic reforms, Sullivan applied to Augusta's City Police Department for a permit under the parade ordinance, infra, proposing three routes over Augusta's streets for a protest march. The march would be held on Saturday, March 20, 2004, between 12:30-2:00 p.m. See Sullivan v. City of Augusta, 310 F. Supp. 2d 348, 351 (D. Me. 2004) ("Sullivan I"). The Police Department indicated it would grant the permit, and, in addition to the $100 base fee, charged Sullivan and the Coalition, as provided for in the ordinance, for what the Police Department estimated would be the cost of the extra police officers and police vehicles needed to control and divert traffic during the event. The Police Department also required the Coalition to provide a bond or other insurance.

Claiming the assessed estimate of traffic control costs and the bond were unconstitutional burdens on the exercise of his rights under the First Amendment, Sullivan moved on March 15, 2004 in the district court for a temporary restraining order ("TRO") enjoining the City from imposing these conditions. The same day, Sullivan filed a complaint in the district court challenging the constitutionality of certain provisions not only of the City's parade ordinance, under which he had sought a permit, but also of

-3-

the City's separate MOGO, under which he had not sought a permit. The district court granted the TRO in part, finding that Sullivan had standing to challenge the parade ordinance and enjoining Augusta from enforcing the bond requirement. The court also considered "the requirements of the application fee and costs of retaining law enforcement services" and concluded that "these portions of the ordinance are constitutional as applied." Sullivan I, 310 F. Supp. 2d at 354-55. The City subsequently amended the parade ordinance to delete the bond requirement, but left intact its other provisions. Thereafter, the Coalition paid the required amounts to the City, the parade permit was issued, and the march took place as scheduled on March 20, 2004. Sullivan did not seek, nor is there evidence he ever discussed with the Police, and the City did not request, that he obtain a second permit, under the MOGO, for the March 20, 2004 event.

Sullivan then amended his complaint on September 28, 2004, adding a second plaintiff, Dansinger. Dansinger had applied for a parade permit in August 2004 for a march he wished to hold in October of that same year. After the City Police Department responded to his application with a letter requiring him to pay a fee and costs of almost $2,000, Dansinger responded that he was unable to pay and sought, without response from the City, a waiver of the total amount of fee and costs. No permit was issued, and the proposed October march did not take place.

Discovery followed the filing of the amended complaint, and the parties submitted the case to the district court on a stipulated record and filed cross motions for judgment on liability. A stipulated record "allows the judge to decide any significant issues of material fact that he discovers." Boston Five Cents Sav. Bank v. Sec'y of Dep't of Housing & Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1986). Here, the agreed-upon record included depositions of Sullivan, Dansinger, Joe Bandy (the plaintiffs' expert witness), and Augusta Deputy Police Chief Major Gregoire ("Gregoire"), and affidavits from Gregoire. Following oral argument, the district court issued a decision holding that the plaintiffs had standing to challenge both ordinances, that their claims were ripe, that various provisions both of the parade ordinance and of the MOGO violated the First Amendment of the Federal Constitution, and that there was no need for the court to abstain from ruling on the challenged ordinances. Sullivan v. City of Augusta, 406 F. Supp. 2d 92 (D. Me. 2005) ("Sullivan II"). The City filed this appeal from the district court's judgment entered in accordance with its decision.

The district court in its decision also found in the City's favor on plaintiffs' claim that it was violative of the Federal Constitution for the City to waive the parade permit fee for an event honoring law enforcement sponsored by the Maine Chiefs

-5-

of Police Association, of which the City is a member.  Plaintiffs did not cross-appeal from that unfavorable finding.

**Facts**

The following facts are taken from the district court's findings based on the stipulated record.  See Sullivan II, 406 F. Supp. 2d at 95-99.  As noted, Sullivan represented the March for Truth Coalition, which wanted to parade on the streets of Augusta to advocate for a variety of causes, including opposition to the Iraq war.  The plaintiffs' challenges to the parade ordinance and the MOGO addressed several elements of both ordinances.

**A.  Parade Ordinance Fee**

Portions of the Parade Ordinance, § 13-5, provide as follows:

> (a)  No less than thirty (30) days prior to an intended parade, march or other use of public ways within the city, a permit must be applied therefor to the City Police Chief or his designee.  The City Manager may allow a shorter time frame for good cause shown.
>
> . . .
>
> (c) Within ten (10) days of applying for the permit, as a condition to its issuance, the applicant must meet with the Police Chief to discuss and attempt to agree on the details of the route and other logistics.
>
> (d) The Police chief may deny the permit or alter the route for traffic or safety reasons and impose reasonable conditions including, but not limited to, time limits, requirement to keep moving and on route, no amplification or sound truck, no explosives, fireworks, or other artificial noise.
>
> (e) The cost of the permit shall be one hundred dollars ($100.00), plus the costs of traffic control per city

-6-

collective bargaining agreement and clean up costs, as estimated by the Police Department. The permit fee will not include the cost of police protection for public safety. The one hundred dollar ($100.00) fee is payable at the time the application is submitted and the balance at the time of its issuance. The City Council may modify this fee from time to time by Order.

Augusta, Me. Code § 13-5 (1991). "If the permit is denied or modified, the applicant may appeal in writing within five (5) days to the City Clerk's office for determination by the City Council." Id. at § 13-5(g).

## B. MOGO

Section 3-116 of the MOGO provides:

(a) It is recognized that a mass outdoor gathering attended by two hundred (200) or more persons may create a hazard to public health and safety. Accordingly, it is deemed to be appropriate and in the interest of the public welfare to regulate the conduct of such gatherings in order to protect the public health and safety.

(b) No person shall sponsor, promote or conduct a mass outdoor gathering with the intent to attract or the understanding that the gathering may attract two hundred (200) or more persons until a permit has been obtained therefor from the Augusta Police Chief or his designee. The application for a permit must be submitted no less than thirty (30) days prior to the mass gathering, unless the City Manager allows a shorter time frame for good cause shown.

Augusta, Me. Code § 3-116 (1991).

Section 3-117 states:

The Police Chief shall grant a permit to sponsor, promote or conduct a mass outdoor gathering to be attended by two hundred (200) or more persons upon written application therefor unless it appears to the Police Chief within a reasonable certainty that such gathering will unreasonably endanger the public health or public safety.

Id. at § 3-117.

Section 3-118 states:

Prior to the issuance of a permit under this article, the applicant shall furnish the Police Chief with adequate proof that the following will be available at the gathering:

(1) The furnishing of adequate and satisfactory water supply and sewer facilities;
(2) Adequate refuse storage and disposal facilities, adequate medical facilities;
(3) Adequate fire and police protection; and
(4) Such other matters as may be appropriate for security of health and safety.

The Police Chief may review such plans, specifications and reports as is deemed necessary for a proper review of the proposed mass gathering.

Id. at § 3-118. The permit fee is $100.00, plus the "cost estimated by the City for cleanup and traffic control." Id. at § 3-120. The MOGO provisions do not apply "to athletic events conducted by the Board of Education, Little League or other organizations, provided alcohol is not available." Id. at § 3-122.

## C. Plaintiffs' Applications

### i. Sullivan's February 9, 2004 Application

Of the three proposed parade routes in Sullivan's February 2004 parade permit application, Augusta Deputy Police Chief Major Gregoire, the officer delegated responsibility, under the Police Chief's oversight, to handle Sullivan's permit application, determined the first would require twelve officers and two police vehicles for traffic control, costing $2,077.44 and the second, ten officers and two police vehicles, costing $1,761.20.

-8-

In later discussions, Gregoire approved a third route, costing, he said, $1,543.08. Sullivan II, 406 F. Supp. 2d at 97. To calculate these costs, Gregoire said he considered only the following factors: "the route to be taken, the duration of the route, the estimated number of people who will attend, whether marchers intend to close the entire road or only one direction of travel, and whether there are any other events or special circumstances within the City which could affect traffic." Gregoire testified that he based his assessment of traffic control needs only on factors "completely unrelated to the message to be communicated by marchers." Sullivan and his March for Truth Coalition did not themselves have the money to pay the permit fee, but they borrowed the necessary funds from another organization. As already noted, the fee was paid, the parade permit was issued, and the march went on as planned on March 20, 2004. At no time did the City intimate that Sullivan or the Coalition needed a second permit, under the MOGO, in order to conduct a lawful march.

### ii. Dansinger's August 23, 2004 Application

On August 23, 2004, Dansinger applied for a parade permit to hold a peace march/rally on October 16, 2004, in conjunction with the Million Worker March scheduled in Washington, D.C., the next day. Dansinger had agreed he would apply for the permit and assumed Sullivan and Tony Aman, another protestor, "would be doing other aspects of the organizing." The Augusta Police Department

responded to Dansinger's application by letter dated September 15, 2004, advising him that, in addition to the initial application fee of $100, approval of the parade permit was conditioned on payment of $1,979.32. Dansinger responded with a September 29, 2004 letter from his attorney, explaining that the permit fee of almost $2,000 created a substantial financial hardship for him and requesting the fee be waived because of his limited financial means. This letter explained that Dansinger's annual income was $8,400, asserted that he could not afford to pay the additional estimated permit fee, and requested that Augusta establish an inability to pay exception for the traffic control fees charged for free speech activities. In spite of Dansinger's assertions of financial hardship, the Augusta Police Department did not offer to waive the fee or any part thereof, Dansinger did not pay the requested amount, no permit was issued, and the proposed October 16 march was not held.

## D. District Court Decision

The district court found that various sections of the City's parade ordinance and MOGO, on facial challenge, violated the First Amendment of the Federal Constitution. The court determined that Section 13-5(e) of the parade ordinance providing that the cost of the permit will be $100, plus the costs of traffic control per city collective bargaining agreement and clean-up costs, as estimated by the Police Department, was unconstitutional because it vested too much standardless discretion in the police. The court

held unconstitutional Section 13-5(a) of the parade ordinance and Section 3-116(a) of the MOGO to the extent that each requires thirty days' prior notice of a parade or MOGO application, unless the City Manager allows a shorter time frame for good cause shown. The court also held unconstitutional Section 13-5(c) of the parade ordinance to the extent it requires, as a condition of its issuance, a meeting between the applicant and the police chief within ten days of applying for the permit to discuss and attempt to agree on the details of the route and other logistics of the parade. The court held unconstitutional Section 13-5(e) of the parade ordinance and Section 3-120 of the MOGO to the extent they contain no avenue for indigent permit seekers to obtain waivers of the fees specified therein. The court also held unconstitutional Section 3-122 of the MOGO, which exempts from permit requirements "athletic events" conducted by the Board of Education, Little League or other organizations, provided alcohol is not available.

Finally, the court noted in its opinion that there was no need for it to abstain from deciding these constitutional questions just because the plaintiffs had not appealed from the denial or modification of any of their permit requests to the City Council, as permitted by the parade ordinance.

**Discussion**

**A.  Standard of Review**

Our review here of the controverted matters is plenary. Legal questions of standing and ripeness are obvious candidates for de novo review, and "where the trial court is called upon to resolve a number of mixed law/fact matters which implicate core First Amendment concerns, the review . . . is plenary so that the court may reduce the likelihood of a 'forbidden intrusion on the field of free expression.'" AIDS Action Comm. v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994) (quoting New York Times v. Sullivan, 376 U.S. 254, 285 (1964)).  Plenary review is called for "simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 567 (1995).[1]

**B.  Standing and Ripeness**

**i.  Standing to Challenge MOGO**

The City of Augusta argues on appeal, as it did below, that the plaintiffs lacked standing to challenge any part of the

_____

[1]We find no merit in plaintiffs' contention that plenary review is reserved only for district court decisions denying First Amendment challenges, while decisions (as here) providing support for First Amendment claims are entitled only to more restricted review.

-12-

MOGO. We agree. For standing to challenge the constitutionality of a particular municipal ordinance such as the parade ordinance or the MOGO, plaintiffs had to show an objectively reasonable possibility that the ordinance would be applied to their own activities. See Osediacz v. City of Cranston, 414 F.3d 136, 143 (1st Cir. 2005). In the case of the parade ordinance, under which Sullivan sought and actually received a parade permit and Dansinger sought, but did not obtain, a parade permit, plaintiffs have made a sufficient showing. But we find no similar showing sufficient to establish standing to challenge the MOGO, the City's mass outdoor gathering ordinance. Plaintiffs did not acquire or seek a MOGO permit. They did not allege, and there was no evidence in the record that anyone connected with the City ever indicated to plaintiffs, that they would be required to obtain a permit under the MOGO as a prerequisite to conducting their proposed street marches, nor was there evidence or even allegations that, in addition to a parade permit, plaintiffs needed, or reasonably believed they needed, a permit under the MOGO in order to conduct such activities in conformity with existing municipal policy and law.

As the district court recognized, the relaxation in First Amendment cases of certain prudential standing requirements does not mean that plaintiffs can dispense with the need to meet core Article III standing principles. Osediacz, 414 F.3d at 141; see

<u>Sec'y of State of Maryland</u> v. <u>Joseph H. Munson Co.</u>, 467 U.S. 947, 956-57 (1984) ("[I]n the area of freedom of expression, an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable," but Munson still must "satis[fy] the requirement of 'injury-in-fact' and whether it can be expected satisfactorily to frame the issues in this case [i.e., its case must be 'ripe'].").

"Injury-in-fact" has been described by the Court as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (citations omitted).  Plaintiffs have failed to carry their burden of showing that they have sustained any injury-in-fact on account of the MOGO.  Without suffering such an injury, they lack standing to challenge the constitutionality of various provisions of that ordinance.

The district court recognized that plaintiffs were required to show injury-in-fact relative to the MOGO, and that to establish such injury in the present circumstances, they must show an objectively reasonable possibility they would need a permit under that ordinance in order to engage lawfully in their intended street marches.  <u>See</u> <u>Osediacz</u>, 414 F.3d at 143.  The court believed that such a showing had been made here.  It construed the language

-14-

of the MOGO as overlapping with that of the parade ordinance. It believed that marches such as plaintiffs sponsored or proposed, while covered by the parade ordinance, could also be considered to be mass outdoor gatherings if held with the intent to attract or with the understanding that the gathering may attract two hundred (200) or more persons; and that under the language of the MOGO, Augusta might (although it did not) require a separate MOGO permit as well as a parade permit.

In the district court's view, the undefined phrase in the MOGO, "mass gathering," could well include a parade. The City might want the sponsor of "a large parade" to furnish the health and safety items specified in the MOGO, i.e., adequate medical facilities, adequate and satisfactory water supply and sewer facilities, and refuse storage and disposal facilities. The court believed that "sewer facilities" could be interpreted to mean portable toilets and that other terms could likewise be read in a way relevant to parades and marches.

The district court believed that the deposition testimony of Deputy Police Chief Major Gregoire, rendered on October 6, 2004, indicated the City's ambivalence about the MOGO's role. Asked whether a parade of 3,000 people for a mile down a City street was a mass gathering, Gregoire replied: "That's--I mean, that's an interpretation. I don't know. I would have to review what the ordinance said. They are moving and that type of thing. They

could be considered a parade. It's a matter of interpretation." In the court's opinion, this reply was inconsistent with, perhaps even contradictory of, Gregoire's subsequent affidavit, dated March 15, 2005, in which Gregoire stated positively, "the City interprets the Mass Outdoor Gathering permit to only apply to a gathering which occurs at a fixed location."

The two, as it believed, inconsistent statements by Gregoire led the district court to conclude, "if Major Gregoire changed his mind once, he could do so again," and to find that "when plaintiffs applied for their permits, there was a reasonable possibility that the City might interpret the MOGO to apply to their conduct." The court ruled that "in light of Major Gregoire's changing testimony and in the absence of a long-standing municipal practice, this Court finds the City of Augusta has not adopted an authoritative interpretation so as to eliminate its application to marches or parades."

With respect, we do not agree with the district court's analysis. We do not think plaintiffs have shown a realistic likelihood that, in addition to a parade permit, the City might have required them to receive a MOGO permit for the marching activities reflected in this record. Textually, we do not read the two ordinances as requiring persons like plaintiffs proposing an ordinary street march on the City's public streets to obtain more than a parade permit. And, if there were any question about this,

Gregoire's affidavit as to the City's interpretation, uncontradicted by anything shown in the record, and supported by the City's consistent willingness to allow these plaintiffs to march without requiring more than a parade permit, is entitled to be credited as reflecting the City's authoritative view that a MOGO permit was not needed.[2]

a. Interpretation of the Language of the Ordinances

Looking first at the text of the parade ordinance, it requires a permit thereunder for "an intended parade, march or other use of public ways within the City" -- precisely the events the plaintiffs intended and for which they sought, and in Sullivan's case received, parade permits. Plaintiffs never sought, nor were they advised by anyone to obtain, a MOGO permit, presumably because the parade ordinance alone referred specifically to parades and marches on the City's public ways, while the MOGO said nothing about moving events of this character. Rather, the MOGO addresses the licensing of what it calls, without further definition, "a mass outdoor gathering with the intent to attract two hundred (200) or more persons." The MOGO thus addresses an undefined (except for the 200-person benchmark) generic class of mass gatherings without any limits as to type or place. In

---

[2]We note, in addition, the total absence of allegations in the amended complaint, or facts in the stipulated record, indicating that the MOGO has in any way chilled or affected plaintiffs' conduct. See infra.

-17-

comparable circumstances -- given two ordinances, one specific and the other general -- Maine's courts, like federal and other state courts, have followed the interpretive rule that "specific statutory provisions take precedence over general provisions." Zeigler v. American Maize-Prod. Co., 658 A.2d 219, 222 (Me. 1995) (quoted with approval in Camps Newfound/Owatonna Corp. v. Town of Harrison, 705 A.2d 1109, 1115 (Me. 1998)). See also Armstrong v. Town of Cape Elizabeth, 2000 WL 33675379 (Me. Super., Dec. 31, 2000) (applying foregoing principle to Cape Elizabeth zoning ordinance). See generally Busic v. United States, 446 U.S. 398, 406 (1980) ("A more specific statute will be given precedence over a more general one . . . ."). Under this interpretive rule, the parade ordinance, which regulates in haec verba the very type of conduct in which plaintiffs intended to engage, i.e., a march on public ways, would seem likely to be construed -- as in fact it has been by the City -- to take precedence over the more general MOGO, which makes no particular mention of conduct of this sort. It seems unlikely, therefore, that the two ordinances would be construed in pari materia, viz. as both applying equally to plaintiffs' proposed marches and as calling for dual permits and

dual fees,[3] and, in fact, no such construction has ever been advanced by anyone on behalf of the City.

One can speculate, to be sure, as did the district court, that giant parades or unusually large or lengthy street marches might give rise to public health concerns similar to those upon which the MOGO focuses. Such hypothetical events, indeed, might even require fixed staging areas, in which case the MOGO might become applicable. But there are neither allegations in plaintiffs' amended complaint nor evidence in the stipulated record that plaintiffs' marches implicated gatherings of over 200 persons, that fixed staging areas or the like were contemplated, or that plaintiffs' marches were so large or of such duration as to give rise to public health considerations that might even arguably implicate a second permit under the MOGO.

Sullivan's application for his march on March 20, 2004 stated it was to last only one and a half hours. Little else can be discerned from the record about the actual characteristics of plaintiffs' marches other than that, in Sullivan's case, the march

---

[3]We would add that the language used to describe the MOGO's requirements, while conceivably able to be stretched to large parades, seems far more apt to fixed locations. "[A]dequate and satisfactory water supply and sewer facilities" could conceivably extend to portable toilets, as the court said, but it is questionable if someone having portable toilets in mind would have described them in that way. At the very least, if the MOGO was meant to regulate the parades and marches already regulated by the parade ordinance, it would seem likely that one of the ordinances would have cross-referenced the other.

occurred and that no suggestion was ever made by anyone that a MOGO permit, in addition to the parade permit, was required. Indeed, plaintiffs' amended complaint alleges that "Plaintiff [Sullivan] was not required in this instance to obtain a Mass Gathering Permit" and also states, "The only barrier to Sullivan exercising his right to free speech and assembly in the traditional public forum of Augusta's streets and sidewalks is his inability to pay over $2,000 for police salaries, police squad car use, and event insurance [all items connected with his application for a parade permit at the time he applied]." Dansinger's march did not occur, but, again, there is nothing whatever in the record to suggest that, in his case, anyone, including the Police Department and Dansinger himself, felt the parade ordinance was by itself insufficient to meet all the City's and the public's regulatory requirements. It is worth noting that paragraph (d) of the parade ordinance allows the Police Chief to "impose reasonable conditions including, but not limited to [certain conditions spelled out in the ordinance]" (emphasis supplied). Under paragraph (d), the Police Chief, without recourse to a separate MOGO permit, could presumably condition issuance of a parade permit on provision of specified facilities he thought reasonably necessary to safeguard public health should he believe the circumstances of a particular parade or march so required.

-20-

Looking simply at the text of the two ordinances, therefore, we think it far less likely than did the district court that they would ever be read as requiring anything but a parade permit for the marches for which plaintiffs requested permits.[4] Significantly, the only allegation in the amended complaint regarding the MOGO's possible relevance is that it "employs legally identical requirements on applicants for mass outdoor gatherings" as does the parade ordinance and is subject to the same constitutional objections. No concrete facts of any kind are alleged showing how or why the MOGO, in addition to the parade ordinance, would apply to plaintiffs' street march activities so as to cause them to suffer injury-in-fact from that ordinance.

b. The City's Interpretation of the MOGO in Gregoire's Affidavit

The City's own interpretation of the MOGO, as expressed in Gregoire's affidavit, has been consistent with the above textual

---

[4]The City contends that for it to have read the two ordinances as requiring duplicative permits would also have violated the rule that statutes should be read so as to avoid constitutional difficulties. Frisby v. Schultz, 487 U.S. 474, 483 (1988). To require two permits for one street march would increase the burdens on those seeking permission to march and would arguably, by that fact alone, further chill their free speech rights. Additionally, the MOGO requirements would be open to challenge under the First Amendment as to whether or not the additional burdens they placed upon plaintiffs' First Amendment rights were excessive. Without passing on the validity of such contentions, we note the obvious fact that an interpretation that each of the two ordinances applied to plaintiffs would increase the scale of possible constitutional difficulties, while an interpretation that only the parade ordinance applies avoids many such difficulties.

-21-

reading. And while this interpretation was formally stated only after this litigation began, plaintiffs have neither alleged nor produced any evidence that the City, before Gregoire's affidavit, requested or received from anyone similarly situated to plaintiffs (much less plaintiffs themselves), a MOGO permit in addition to a parade permit. In other words, the City's actions have at all times been consistent with the City's interpretation stated in Gregoire's affidavit that the MOGO applies only to mass gatherings at fixed locations.

Deputy Chief Gregoire, who handled both types of permits for many years, testified to much experience with parades but very few mass gatherings, from which it would appear that the MOGO was not widely employed, and, one might infer, was not employed in duplicate fashion with parades. The fact that Sullivan's March 20, 2004 march took place with only a parade permit, issued without suggestion from the Police Department that he also needed a MOGO permit (which, like the parade permit, is handled by the Police Department), strongly supports the City's position, asserted in Gregoire's affidavit, that it interprets the MOGO to apply only to mass gatherings at fixed locations, not to parades and marches. It is plaintiffs' burden to establish injury-in-fact as an essential part of their standing -- not the City's burden to disprove it. See, e.g., FW/PBS v. Dallas, 493 U.S. 215, 231 (1990) (holding that standing must affirmatively appear in the record and it is the

burden of the party seeking the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute). See also Lujan, 504 U.S. at 560-61; Osediacz, 414 F.3d at 139.

Here the evidence the district court saw as indicative of an ambivalent City policy to require a MOGO permit in addition to a parade permit was Gregoire's early deposition testimony, responding to a question whether a parade of 3,000 people for a mile down the street was a mass gathering. Gregoire's response was "That's--I mean, that's an interpretation. I don't know. I would have to review what the ordinance said." Gregoire then went on to say, in the same response, "They are moving and that type of thing. They could be considered a parade . . ." (emphasis supplied). Six months later, the City submitted to the court Gregoire's affidavit stating unequivocally, "The City interprets the Mass Outdoor Gathering permit to only apply to a gathering which occurs at a fixed location."

Between Gregoire's earlier deposition testimony and his later affidavit stating the City's final position, we see no discrepancy such as to warrant the district court's finding that he had a "change of mind." His deposition response came in answer to a question that could easily have caught Gregoire by surprise, about whether an enormous hypothetical 3,000 person parade extending for a mile would be a mass gathering. Gregoire said, in

-23-

effect, he didn't know -- he would have to review what the MOGO said. Even so, he then suggested that, "They could be considered a parade." In the six months that followed, Gregoire had the opportunity to review the issue, to reread the ordinances, and to consult with the Police Chief and other City officials, after which his affidavit was filed stating unequivocally the City's interpretation of the MOGO. That he consulted with superiors and spoke for the City, not just himself, can be inferred from the fact that in the affidavit he purported, under oath, to speak for the City; it is only reasonable to assume that a ranking officer like Gregoire would not have purported to speak for the City in important litigation of this type without first obtaining authorization. While he was not the Police Chief or City Manager, he was the second in command in the Police Department, the agency empowered by the two ordinances to issue both parade and mass outdoor gathering permits, and, subject to the Chief, was in charge of reviewing and acting upon applications to hold parades and marches in Augusta.

As we say, we can see no contradiction between Gregoire's guarded reply during his earlier deposition and his later affirmative affidavit. The earlier response at most suggests uncertainty. He said nothing directly contrary to what he later represented in his affidavit was the City's interpretation. That the City interpreted a MOGO permit to apply only to a gathering

which occurs at a fixed location fits reasonably within the language of the two ordinances, supra, is consistent with the City's practices as reflected in this record, and is entitled to be taken as an authoritative representation of the City's interpretation of its own ordinance. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it").

This is not a case where the agency's interpretation during a lawsuit repudiates its earlier interpretation, suggesting the later-announced interpretation might be a ploy to end the lawsuit and leave the agency free to return subsequently to the very practices that caused the plaintiff to sue. There is absolutely no evidence to suggest that Gregoire's affidavit of the City's interpretation constituted a repudiation of or departure from some earlier different practice of the City, nor have plaintiffs so alleged. Compare Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (observing that defendants' cessation of challenged practice during course of litigation did not guarantee they would not return to practice after dismissal). The district court criticized the City for not establishing that Gregoire's assertion of its interpretation reflected "a longstanding municipal practice," but the City's

treatment of these plaintiffs has from the start been entirely consistent with the interpretation of the MOGO stated in Gregoire's affidavit, and plaintiffs, whose burden it is, have produced no evidence of any inconsistency at any time in the City's treatment of others. We see no reason not to accept the City's asserted interpretation under these circumstances.

We hold that plaintiffs did not meet their burden of establishing a "reasonable possibility" that, in applying to hold their street marches along City streets, they were or would be held subject to the MOGO as well. We conclude, therefore, that plaintiffs lack standing to litigate the various issues they raise concerning the alleged defects in the MOGO as distinct from those in the parade ordinance. We vacate the district court's judgment insofar as it relates to any of the provisions of the MOGO.

Because plaintiffs lack standing to challenge the MOGO, we need not examine the "ripeness" of their MOGO claims. Without standing, plaintiffs' challenges to the MOGO provisions must be dismissed.

**ii. Standing to Challenge the 30-Day Advance Application Requirement in the Parade Ordinance**

The City argues that the plaintiffs do not have standing to challenge the provision in the parade ordinance, § 13-5(a), requiring applicants to apply for a permit "no less than 30 days prior to an intended parade, march or other use of public ways

within the City."  The City does not challenge plaintiffs' standing to mount constitutional claims as to any other provisions within the parade ordinance.  The City notes that plaintiffs never demonstrated any intent or need to apply for their parade permits fewer than thirty days before the marches for which the permits were being sought.  Sullivan made a timely application for his permit, which ultimately he received.  Dansinger never completed his application for a parade permit, but was timely in his initial application, so that it does not appear the 30-day requirement was, for him, a stumbling block.

But, notwithstanding their apparent ability to comply, we believe the plaintiffs have standing to challenge, along with other provisions of the parade ordinance, the constitutionality of the thirty-day advance application provision.  While it is true they never applied later than the thirty days before the sought-for permit, a late application is not necessary if injury can otherwise be surmised.  Osediacz, 414 F.3d at 143.  Sullivan indicated such injury in his deposition testimony that in late March 2004, he was deterred from applying for a permit for an intended April 10, 2004 street march because it was too late for him to comply with the thirty-day advance notice requirement.[5]  Sullivan's testimony was,

_____

[5]The thirty-day provision, to be sure, is qualified by authorization to the City Manager to "allow a shorter time frame for good cause shown."  But because we find that essentially standardless provision to be insufficient to redeem the thirty-day requirement, infra, we believe that Sullivan's complained-of

-27-

we believe, enough to permit plaintiffs to pursue a facial challenge to the thirty-day requirement as part of their overall attack on various aspects of the parade ordinance.

Because there was a showing of injury sufficient for standing to attack the thirty-day provision, we need also to determine the ripeness of this claim.

Ripeness calls for an evaluation of the fitness of the claim and the hardship to plaintiffs of withholding immediate judicial consideration. Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999). We have said that when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements. El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 496 (1st Cir. 1992) (stating that a "facial challenge of this sort, implicating First Amendment values, customarily works a relaxation of the ripeness criteria"). The rationale for this relaxation is said to stem from a fear of "irretrievable loss." Id. Thus, when First Amendment claims are presented, "[r]easonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995) (quoting Martin Tractor Co. v. Federal Election Comm'n, 627 F.2d 375, 380 (D.C. Cir.), cert. denied, 449

---

deterrence suffices to establish injury, especially where there is no question as to plaintiffs' standing to challenge, on First Amendment grounds, other aspects of the very same ordinance.

U.S. 954 (1980)).  The standing and ripeness concerns are intertwined, with the core issue being the reasonable fear of enforcement.  <u>Whitehouse</u>, 199 F.3d at 33.  Here, Sullivan testified to believing that the requirement to apply for a parade permit thirty days before the event blocked his eligibility to receive a permit for a short-notice street march he wished to hold on April 10, 2004 and that, as a result, he did not apply for a permit and did not hold the march.  His concern as to this provision is closely linked to other concerns of and alleged injuries to plaintiffs stemming from the parade ordinance's effect upon them. We believe plaintiffs' challenge to the thirty-day provision is fit to be decided now in this litigation, and that it would be a hardship to plaintiffs were we not to do so.  The challenge to the thirty-day requirement was and is ripe for present review.

**C.  Parade Ordinance Issues**

The district court struck down several provisions in the parade ordinance as unconstitutional, holding them facially to violate the First Amendment of the Constitution.  Before considering each of these in turn, we discuss certain generally applicable principles mentioned also by the district court. <u>Sullivan II</u>, 406 F. Supp. 2d at 106-07.

The district court properly held that protest street marches such as the ones plaintiffs conduct are forms of assembly and expressive speech protected by the First Amendment.  <u>See</u>, <u>e.g.</u>,

<u>Hurley</u>, 515 U.S. at 568.  That protection is not absolute, however, since the First Amendment rights must be harmonized with the "existence of an organized society maintaining public order without which liberty itself would be lost . . . ."  <u>Cox</u> v. <u>State of New Hampshire</u>, 312 U.S. 569, 574 (1941).  The Supreme Court went on to say in <u>Cox</u> that regulating the use of the public streets and restricting the use of highways to promote the public convenience, "cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection."  <u>Id.</u> at 574.  The Court thus upheld in <u>Cox</u> a municipality's right to require marchers to obtain a license and pay a fee (not more than $300, at the time) before parading on public streets.  The Court stated that "the question in a particular case is whether . . . [the City's] control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places."  <u>Id.</u>

A notable aspect of the Supreme Court's analysis in <u>Cox</u>, as the district court observed, is that a municipality's parade permit ordinance is not to be reviewed as a "prior restraint" but as a reasonable regulation of the "time, place and manner in relation to the other proper uses of the streets."  <u>Cox</u>, 312 U.S. at 576.  The Supreme Court has recently reiterated this standard in

-30-

regard to a municipality's content-neutral regulation of parades and other public assemblies in its parks.  See Thomas v. Chicago Park District, 534 U.S. 316, 322-23 (2002).[6]

Augusta's instant parade ordinance is plainly content-neutral, as the district court found.[7]  Unlike regulations that are not content-neutral, which are reviewed under a harsher strict-

---

[6]In Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989), the Supreme Court explained that "the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  The main inquiry is not whether certain speakers are disproportionately burdened, but rather, whether the reason for the differential treatment is, or is not, content-based. See Hill v. Colorado, 530 U.S. 703, 719-20 (2000).

[7]While acknowledging that the parade ordinance is content-neutral on its face, the plaintiffs have argued to us that Augusta applied the ordinance in a viewpoint-discriminatory manner by waiving the parade permit fee for the Maine Chiefs of Police Association's annual parade.  The district court disagreed.  It found that the City's waiver of the fee did not "disfavor or suppress one viewpoint in favor of another."  Rather, it held, Augusta had merely used its funds permissibly to promote a speaker deemed to be in the public interest.
Although plaintiffs now argue against the district court's resolution of this issue, they have never filed a cross-appeal from the district court's determination that the waiver of fee for the Maine Chiefs of Police Association's annual parade is constitutionally permissible.  We therefore lack jurisdiction to consider plaintiffs' objections to the district court's specific ruling on this issue.  See United States v. Craven, 239 F.3d 91, 103 (1st Cir. 2001); Justice for All v. Faulkner, 410 F.3d 760, 772 (5th Cir. 2005).  Cf. Johnson v. Teamsters Local 559, 102 F.3d 21, 28 (1st Cir. 1996) (dismissing late-filed cross-appeal for lack of appellate jurisdiction).  To the extent plaintiffs pursue this claim on appeal on the ground that we may affirm the district court's judgment invalidating the fee provision on any basis supported by the record, we concur with the district court that the waiver of the permit fee did not constitute viewpoint discrimination.

-31-

scrutiny standard, e.g., United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000), content-neutral regulations are reviewed under so-called intermediate scrutiny. Intermediate scrutiny calls for narrow tailoring to serve a legitimate, content-neutral governmental interest, but the tailoring need not be the least restrictive nor the least intrusive possible. Ward, 491 U.S. at 798. See also Casey v. City of Newport, 308 F.3d 106, 110-11 (1st Cir. 2002); Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736-37 (1st Cir. 1995). Time, place and manner regulations of this type are constitutional if they: (1) do not delegate overly broad licensing discretion to a government official; (2) are narrowly tailored to serve a significant governmental interest;[8] and (3) leave open ample alternatives channels for communication of the information. Thomas, 534 U.S. at 323; New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002). We apply these standards in our review of Augusta's parade ordinance.

We turn now to the constitutionality of the different parade ordinance provisions.

_____

[8]Justice Kennedy, writing for the majority in Ward, emphasized that while narrow tailoring in the content-neutral context was more relaxed, the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799.

### i. Traffic Control Fee

Plaintiffs contend, as the district court held, that even under the intermediate scrutiny afforded content-neutral time-place-manner regulations, the fee provision of the parade ordinance is unconstitutional. Section 13-5(e) provides, "The cost of the permit shall be one hundred dollars ($100), plus the costs of traffic control per city collective bargaining agreement and clean up costs, as estimated by the Police Department."  The ordinance further provides, "The permit fee will not include the cost of police protection for public safety."  The $100 fee is payable at the time the application is submitted and the balance at the time the permit is issued.

The district court held that the fee provision delegated overly broad discretion to the Augusta Police Department to determine the costs of traffic control -- costs which plaintiffs were required to pay as a part of the total parade permit fee. Citing Forsyth, 505 U.S. at 132-34, the court ruled that the fee provisions of the parade ordinance were lacking in narrow, objective and definite standards sufficient to guide the discretion of the Augusta Police Department in estimating the costs of traffic control.  Sullivan II, 406 F. Supp. 2d at 116.

The district court refused to consider as supplementing the ordinance's own standards an affidavit from Deputy Chief Major Gregoire in which he stated certain of the factors on which he

based his calculation of the traffic control fee. Id. at 116-17. The district court ruled that the factors set forth in Gregoire's affidavit went beyond anything found in the text of the ordinance itself and were not shown to reflect the City's "well-established practice," citing City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 770 (1998). Id. at 117.

The district court also found that "the City charged Mr. Sullivan $478.55 more than its actual overtime payments" to the officers who served on the detail assigned to Sullivan's March 20, 2004 parade. This overcharge resulted from the fact that the City estimated how many officers would be needed for traffic control, and what they would be paid, before it knew which particular officers would be available for the parade detail. Id. at 121-22. The City's collective bargaining agreement requires paying each officer for a minimum overtime shift of four hours, but the pay rate of individual officers differs. In the present case, the original estimate exceeded by $478.55 the cost of paying the officers who took part in the March 20, 2004 parade detail. Sullivan paid the original estimate, and no refund was tendered. The district court rejected the City's argument that the pay overcharge was offset by the City's not charging Sullivan for certain of its administrative expenses, such as Gregoire's own time to schedule and organize the parade detail. There was no evidence in the record as to the latter costs. Pointing to precedent that

-34-

only a fee defraying actual expenses is permissible, and that excess fees are unconstitutional, the district court held that the fee was "overbroad" as it "does not bear a direct or precise relationship to the actual costs incurred." Id. at 122.

Plaintiffs complained below, as they do now, that the Police Department's determination of the estimated cost of traffic control "relies heavily on a judgment call about the number of officers that are required to provide traffic control" because the department "has never established any written criteria or formula for calculating the number of officers or vehicles as part of its estimate of the traffic control cost." They argue this "broad subjectivity and discretion" was highlighted by the police department's increase of "its estimate by twenty percent, from eight to ten, for the number of police officers needed to provide traffic control for the parade route used on April 8, 2003 when the same exact route was proposed for the March 20, 2004 parade." They additionally argue that the provision's excessive discretion and overbreadth are demonstrated by the fact the City overcharged them for the actual cost of the additional officers during the March 2004 parade organized by Sullivan.

a. Excessive Discretion

We disagree with the district court and appellees that the parade ordinance fee provisions lack sufficiently precise and definite standards to guide the police. We agree, however, that

-35-

the permit fee charged to and paid for by Sullivan for the March 20, 2004 parade, which the court found was incorrectly inflated by nearly $500, was, to that extent, unconstitutional as applied.

In deciding that the fee provision in the parade ordinance granted constitutionally "excessive" or "unfettered" discretion to the Augusta Police, the district court relied particularly upon the Supreme Court's holding in Forsyth, 505 U.S. at 137. In that case, a county ordinance mandated permits for private demonstrations and other uses of public property, required advance payment of a daily fee of no more than $1,000, and empowered the county administrator to "adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order." Id. at 123. The Court found the ordinance unconstitutional, noting, inter alia, (1) the county administrator's "unfettered discretion" to determine what expenses to include and to set the amount of the fee,[9] and (2) the fact that the ordinance allowed the fee to include the costs of "necessary and reasonable protection of persons participating in or observing said . . . activities." Id. at 133. The Court held the

---

[9] The Court emphasized the total absence of "articulated standards either in the ordinance or in the county's established practice," to guide the administrator's fee-setting discretion. "The decision how much to charge for police protection or administrative time--or even whether to charge at all--is left to the whim of the administrator." 505 U.S. at 133.

latter costs were an improper charge upon the permittee, equating it with basing a fee on the content of the speech.  Id. at 133-36.[10]

While Forsyth stands as a clear warning against vesting governmental officials with excessive discretion in regard to fee-setting,[11] and while "even content-neutral time, place and manner restrictions can be applied in such a manner as to stifle free expression," Thomas, 534 U.S. at 323, the range of fee-setting discretion granted to the county administrator in Forsyth far exceeded that granted here to the Augusta Police Chief and Police Department.  In Forsyth, unlike here, the county administrator was not limited to estimating, as part of the fee, a particular category of expenses within the administrator's expertise, like the costs of traffic control.  Instead he had discretion to decide the kind and amount of administrative and policing expenses to include (or exclude) from the fee, and it appears that he also assumed the right to charge nominal or no fees to favored groups.  Forsyth, 505 U.S. at 131-32 & n.9.

---

[10]Forsyth involved a content-based, not content-neutral, ordinance, but the analysis of overly broad discretion as discussed in Forsyth has also been applied in cases involving content-neutral ordinances.  See Thomas, 534 U.S. at 323.

[11]Citing Forsyth and Niemoto v. Maryland, 340 U.S. 268, 271 (1951), the Thomas Court stated, "We have thus required that a time, place and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review."  534 U.S. at 323.

The fee-setting authority of the Augusta Police Department is far more confined here. The ordinance provides, "The costs of the permit shall be one hundred dollars ($100) plus the costs of traffic control per city collective bargaining agreement and clean-up" (emphasis supplied). The Police are given no discretionary authority to estimate and charge costs other than the costs of traffic control and clean-up, nor are they authorized to vary the character of the costs as between applicants: the cost of each permit "shall be" as described, resulting in a uniformly-computed fee for each applicant. The cost of hiring police officers for traffic control is "per city collective bargaining agreement," requiring reference to that agreement for the amount to be paid to each officer. Finally, the "cost of police protection for public safety," the item the Supreme Court found to be improperly included in the Forsyth County ordinance, is expressly excluded by the parade ordinance from the costs passed on to permit applicants.

Given the above limitations, the principal area left to police discretion in estimating the Augusta permit costs lies in determining the number of extra officers and police vehicles to assign to a particular parade or march for traffic control purposes. Plaintiffs complain the City has failed to articulate a precise "formula" to guide the police in performing this estimate. However, the plaintiffs have pointed to no evidence that there

exists any meaningful advance "formula" that could be inserted in an ordinance to determine the number of needed officers and vehicles in a given case. Parades and marches obviously vary enormously in terms of size, timing, duration and location, resulting often in quite different traffic control needs. Experienced, professional judgment would seem to be the most likely way to estimate how many extra officers will be needed. The City states that the present marches involved the use of very heavily trafficked streets, requiring diversion of traffic elsewhere during the event. It is hard to see any purely mechanical means for determining how many officers would be needed to direct traffic at the various intersections of differing routes and neighborhoods.

In any case, plaintiffs have offered no example of the sort of "formula" they have in mind. In the circumstances, it seems reasonable for the City to rely upon the experienced judgment of its Police Department to determine personnel and police vehicular needs for traffic control at a particular applicant's parade or march. We take judicial notice that traffic control is a major responsibility of local police departments around the nation. Rerouting and directing traffic around construction sites, accident scenes and the like are tasks the police regularly perform. The police, moreover, know the traffic patterns and problems along the different streets in their particular city and its neighborhoods. Augusta could reasonably believe that its

Police Chief and his staff had the expertise to estimate, case by case, the additional personnel and equipment needs for a traffic control detail established to handle traffic problems caused by a march on city streets. And once these needs are ascertained, the City's collective bargaining agreement provides objective pay information for determining overall costs.

In ruling that the ordinance provided insufficient standards, the district court refused to take into account Gregoire's affidavit that in determining the detail needed for plaintiffs' marches, he was guided by certain implementing criteria--criteria not unlike those a police officer said he considered for similar purposes in Stonewall Union v. City of Columbus, 931 F.2d 1130, 1135 (6th Cir. 1991). Speaking about the costs charged to plaintiffs, Gregoire stated that the size of the traffic control detail "is based only on factors which are completely unrelated to the message to be communicated by marchers" and includes the route to be taken, the duration of the route, the estimated number of people who will attend, whether marchers intend to close the entire road or only one direction of travel, and whether there are any other events or special circumstances within the City which could affect traffic.

We need not decide if Gregoire's affidavit should have been given weight here. Regardless, it is difficult to see that his stated criteria added much of constitutional import to what can

-40-

be gleaned from the terms of the ordinance itself. See supra. An ordinance of this type must furnish "narrowly drawn, reasonable and definite standards" that are "reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.'" Thomas, 534 U.S. at 324 (quoting Forsyth County, 505 U.S. at 133). We believe Augusta's ordinance furnished such standards quite apart from the matters Gregoire mentioned.

The parade ordinance directed the Police Department to calculate the costs of traffic control and clean up relative to the particular event for which a permit was sought. The making of a relevant professional judgment of this kind may properly be delegated to police and other officials. See Kinton, 284 F.3d at 26 (noting that "[p]ublic safety and convenience are paradigmatically permissible considerations in the issuance of permits" and judgments about public safety are inherently within the competence of permitting officials). The factors Gregoire listed in his affidavit for determining the size of the traffic control detail -- the parade route, its duration, the estimated number of people who will attend, whether entire or partial road closure is involved, and whether there are other events or special circumstances affecting traffic -- added few if any considerations that would not seem perfectly obvious to anyone asked to determine traffic control costs relative to a particular parade or march on city streets. And, as previously noted, the ordinance itself rules

-41-

out charges that might be said to relate to the message "to be communicated by the marchers" by excluding altogether from the permit fee "the cost of police protection for public safety."

To be sure, the ordinance is terse; more extended glosses provided by written standing orders and the like might arguably be helpful in some way. But we believe the parade ordinance's fee provision affords, by itself, sufficient "narrowly drawn, reasonable and definite standards" so that the fee-setting decision is not left "to the whim of the administrator." Thomas, 534 U.S. at 324 (quotation omitted). Our duty is not to determine whether the ordinance meets ideal standards but whether it passes the constitutional threshold.

Plaintiffs, in addition to challenging the wording of the ordinance on its face for alleged absence of fee-setting standards, challenged the fee charged to Sullivan as being constitutionally excessive as applied. The district court agreed. Here, we believe, both appellants and the court are on firm ground. The district court found that Augusta charged Sullivan $478.55 more than the City's actual overtime payments to its officers for the March 20, 2004 march. The City's defense on appeal (apart from arguing the overcharge was so small as to be de minimis) is that it was offset by other expenses not charged plaintiffs by the City, such as the cost of Gregoire's time in processing Sullivan's permit application. The City, however, never purported to include this

latter type of expenses in its calculation of traffic control costs. There is, moreover, no evidence to show what such other costs were. We agree with the district court that it was too late in the day for these supposed costs to be plugged into the present fee equation. A mistaken calculation of nearly $500 cannot in this context be considered de minimis. Sullivan's overcharge was contrary to the ordinance's language limiting the fee to $100 "plus the costs of traffic control per city collective bargaining agreement and clean up" (emphasis supplied).[12] Amounts estimated in advance but never actually charged to the City are not a part of the "costs" of traffic control.

The Supreme Court has held that a government cannot profit from imposing licensing or permit fees on the exercise of a First Amendment right. Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1993). Only fees that cover the administrative expenses of the permit or license are permissible. Cox, 312 U.S. at 577 (approving

---

[12]One way to guard against, or at least correct, a future overcharge of this sort would be to include in the parade ordinance a provision permitting some type of readily available administrative review process. Augusta's ordinance allows a parade permit applicant to appeal in writing to the City Council within five days if "the permit is denied or modified," § 13-5(g). But there is no explicit right to appeal from a fee overcharge. See Forsyth, 505 U.S. at 133 (noting with disapproval that administrator's fee decision was "unreviewable"); Thomas, 534 U.S. at 23 (noting with approval fact that the ordinance was "enforceable on review--first by appeal to the General Superintendent of the Park District . . . ."). The absence of an explicit review process for fee overcharge was not raised as a possible constitutional defect by plaintiffs and hence is not a matter for our consideration on appeal.

-43-

of a fee "limited to the purpose stated" of meeting "the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed"); Citizens Action Group v. Powers, 723 F.2d 1050, 1056 (2d Cir. 1983) ("Licensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose."); Fernandes v. Limmer, 663 F.2d 619, 633 (5th Cir. 1981) (invaliding a $6 per day fee for permit to distribute religious literature in a municipal airport because of failure to restrict use of fee receipts to expenses of licensing process).

It is a violation of the First Amendment to have charged Sullivan more than the actual administrative expenses of the license, as set forth in the ordinance. Thus, although we find the standards for the permit fee to be sufficiently definite to pass constitutional muster, we uphold the district court's invalidation, as applied, of the excessive amount charged to Sullivan.

b.  Thirty-Day Notice Requirement

The plaintiffs argued successfully below that the parade ordinance's requirement that applicants apply for a permit "[n]o less than thirty (30) days prior to an intended parade, march or other use of public ways within the City," coupled with authorization to the City Manager to "allow a shorter time frame for good cause shown" is not narrowly tailored and vests too broad discretion in City officials. We agree.

Notice periods restrict spontaneous free expression and assembly rights safeguarded in the First Amendment. People may, in some cases, wish to engage in street marches in quick response to topical events. While even in such time-sensitive situations, a municipality may require some short period of advance notice so as to allow it time to take measures to provide for necessary traffic control and other aspects of public safety, the period can be no longer than necessary to meet the City's urgent and essential needs of this type. American-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 605 (6th Cir. 2005) ("Any notice period is a substantial inhibition on speech."). Advance notice requirements that have been upheld by courts have most generally been of less than a week. See, e.g., A Quaker Action Group v. Morton, 516 F.2d 717, 735 (D.C. Cir. 1975) (two-day advance notice requirement is reasonable for use of National Park areas in District of Columbia for public gatherings); Powe v. Miles, 407 F.2d 73, 84 (2d Cir. 1968) (two-day advance notice requirement for parade is reasonable); Progressive Labor Party v. Lloyd, 487 F. Supp. 1054, 1059 (D. Mass. 1980) (three-day advance filing requirement for parade permit approved in context of broader challenge); Jackson v. Dobbs, 329 F. Supp. 287, 292 (N.D. Ga. 1970) (marchers must obtain permit by 4 p.m. on day before the march), aff'd, 442 F.2d 928 (5th Cir. 1971). Lengthy advance filing requirements for parade permits, such as the present thirty days, have been struck down as

violative of the First Amendment.  See American-Arab Anti-Discrimination Comm., 418 F.3d at 605-07 (holding that provision requiring thirty days' notice is overbroad and is not saved by an unwritten policy of waiving the provision); NAACP, Western Region v. City of Richmond, 743 F.2d 1346, 1357 (9th Cir. 1984) ("[A]ll available precedent suggests that a 20-day advance notice requirement is overbroad.").  Even five days has been held too long in certain circumstances.  See Douglas v. Brownell, 88 F.3d 1511, 1523-24 (8th Cir. 1996) (city's asserted goals of protecting pedestrian and vehicular traffic and minimizing inconvenience to the public does not justify five-day advance filing requirement for any parade, defined as ten or more persons).

The City argues that its interest in having advance notice of a parade in order to control traffic, prevent scheduling conflicts, ensure adequate facilities are available, and assign personnel to safely close the streets is narrowly tailored.  The City points out that its police force is relatively small, with only thirty-four officers available for assignment to parade details.[13]

---

[13]Citing Thomas v. Chicago Park Dist., 534 U.S. 316 (2002), the City points out that the Court upheld a Chicago ordinance allowing a total of up to 28 days for the Park District to grant or deny a permit application.  However, the facts are not comparable to the present case, and the question of whether that time period was too lengthy does not appear to have been directly at issue in Thomas, id. at 323-34.

But while those factors are entitled to due weight, applicants' First Amendment rights have countervailing strength, and these require the City in time sensitive situations to accommodate proposed parades and marches much more quickly than within thirty days. See Church of the American Knights of the Ku Klux Klan v. City of Gary, 334 F.3d 676, 682 (7th Cir. 2003) (noting "the reasonableness in general of requiring that a permit to hold a demonstration on city streets or other public property be sought in advance of the event," but observing that "the length of the required period of advance notice is critical to its reasonableness; and given . . . that political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech" (emphasis supplied)). Hence, while practical considerations, such as the scheduling of additional needed officers, will justify a short period of advance notice, a blanket rule requiring the permit application to be made in all cases no fewer than thirty days prior to an intended parade, march, or other use of public ways is not narrowly tailored and so violates the First Amendment.

While the above is clear, the City contends that its thirty-day rule is not blanket and that it has made a sufficient exception for the kind of spontaneous demonstrations mentioned above, as "[t]he City Manager may allow a shorter time frame for

good cause shown" (emphasis supplied). The district court and plaintiffs, however, insist that the "good cause" standard is too vague and subjective to serve as a sufficient guide to the City Manager's discretion, and that the exception is, therefore, inadequate to establish the constitutionality of the advance notice requirement.

We think the exception does not save the unduly lengthy application period. If the "good cause" exception were attached to a reasonably short application period, we might rule otherwise. But as a device to cure a standard requirement of some thirty days, it is inadequate, requiring, as it does, that all persons desiring to seek a parade permit within some entitled shorter period shoulder the burden of convincing the City Manager of the existence of "good cause." Such a requirement curtails an applicant's free speech rights, both because of the additional effort the applicant need make in order to claim those rights and the risk that the City Manager may not realize from the phrase "good cause" that many applicants will be entitled, routinely, to a shortening of the period.

It is true that Gregoire, in a supplemental affidavit, stated, "[a]s long as the Police Department is physically able to contact the officers and make the appropriate arrangements to close the road and have the appropriate traffic officers on duty, the City would not deny the permit based on the timing of the

application." But the district court supportably ruled that Gregoire's supplemental statement is not shown to constitute a binding administrative interpretation or evince well-established practice.[14]

We affirm the district court's conclusion that the present thirty-day time period, as drafted, is unconstitutional for the reasons we have stated.

c. Meet and Attempt to Agree Provision

The plaintiffs argued below that the parade ordinance's requirement that "[w]ithin ten (10) days of applying for the permit, as a condition to its issuance, the applicant must meet with the Police Chief to discuss and attempt to agree on the details of the route and other logistics," is not narrowly tailored to serve significant governmental interests because (1) forcing an in-person meeting with the police chief within ten days from applying for the permit creates an unreasonable time barrier that burdens unnecessarily a citizen seeking to promote a spontaneous or prompt demonstration in response to a time-sensitive issue or event; and (2) the details of the route may be an important part of the applicant's expressive activity and thus the applicant should not be required to negotiate with the government about the manner

---

[14]Nothing herein, of course, prevents the City from merely urging, as opposed to requiring, the submission of permit applications, when possible, within some longer advance period like thirty days, so long as it is clear that an applicant is bound only by a shorter period, as discussed.

of expression. Plaintiffs also argued that applicants who are uncomfortable dealing directly with the police chief, such as an applicant wishing to protest alleged civil rights abuses by police, might be discouraged from applying for a parade ordinance altogether. The district court concluded that "the in-person meeting requirement chills substantially more speech than is necessary to achieve the end [of promoting public health and safety]."

The City argues on appeal that while the district court agreed there is a significant governmental interest in gathering information on parade logistics, it erroneously applied a least intrusive means analysis consistent with strict scrutiny, rather than the more relaxed narrow tailoring analysis appropriate in intermediate scrutiny. Ward, 491 U.S. at 797-98.

The City further contends that the most effective way to arrange a parade route with the police department is to do so in person and states that it has a policy of not rigidly adhering to the requirement of a face-to-face meeting if it is not necessary to serve the stated purposes of the ordinance. The plaintiffs reply that there are no guidelines to suggest when such a waiver would be granted and that the supposed policy of not rigidly adhering to the meeting requirement (which the ordinance states is "a condition" to issuance of the permit) is unsupported by any written criteria, evidence of established practice, or specific precedent.

While the question is close, we believe the provision is overbroad in certain respects, especially given its unyielding language (the applicant "must meet with the Police Chief" and do so "as a condition to [the permit's] issuance"--the latter seeming to rule out the police department's alleged policy of not always requiring a face-to-face meeting). We agree with the City, however, that meeting face-to-face with the Police Chief is not an unreasonable way in most instances to work out a route, and that this requirement, as a general rule, is constitutionally acceptable, provided provision is made for reasonable exceptions. For one, it would seem necessary to allow for meeting with the Chief's delegate in case the chief is unavailable. For another, it may be unduly burdensome for a parade organizer who lives, or whose work takes him, some distance away from the City, to sit down with the Chief or his delegate. And there is the possibility that some activist leaders may experience the kind of acute discomfort that plaintiffs hypothesize at sitting down with the Chief because of the nature of their cause. All of these concerns, to a greater or lesser degree, suggest that in this age of e-mail, express mail, fax and telephone, requiring, inflexibly, meeting with the Chief in person within the specified ten-day period as a mandatory condition of issuance of the permit burdens substantially more speech than is necessary. Ward, 491 U.S. at 799.

The City can address the problem in various ways. One way, of course, is simply to provide some acceptable alternatives to meeting with the Chief. Another would be to provide that an applicant may, if good cause existed, request an alternative, and the Chief or his delegate should allow the request if reasonable and practicable to do so. To take the above concerns into account is not equivalent to applying the inappropriate least-restrictive means test, see Ward, 491 U.S. at 797-98, but rather applies the principle that a regulation of this type may not burden substantially more speech than is necessary to further the government's legitimate interests. Ward, 491 U.S. at 799. Hence, one or more alternatives to a face-to-face meeting with the Chief need to be provided. Lacking such alternative or alternatives, the meeting provision as it currently stands is overbroad.

    d.  Absence of Waiver of Fees for Indigent

    The plaintiffs argued below that the parade ordinance is unconstitutional on its face and as applied because it does not provide any exception or reduction to the potentially large permit fee for citizens or groups for whom the fee causes a substantial hardship. They argued successfully to the district court that the lack of a financial exemption leaves those citizens and groups unable to pay the fee without "open, ample alternatives for communication." Where, as here, however, there are ample alternative forums for speech, we see insufficient justification

-52-

for the district court's ruling that the Constitution mandates an indigency exception, in effect forcing general taxpayers to support financially a particular organizer's event.

i.   District Court's Analysis

The district court relied on the Supreme Court's assertion in Murdock, 319 U.S. at 111, that "[f]reedom of speech, freedom of press, freedom of religion are available to all, not merely to those who can pay their own way."  The district court observed that in cases where bonds and insurance premiums are required for a parade permit, courts have found that the requirements imposed financial demands that burdened the expressive activities of those with insufficient financial means more than necessary to achieve the governmental interest.  The district court asked whether the sidewalks and parks of a city represent a reasonable alternative to the streets and concluded, based on the testimony of a sociologist called as an expert witness by the plaintiffs, that sidewalks have less symbolic significance than do streets and are inadequate as alternatives for logistical reasons.

Plaintiffs' expert witness was an assistant professor of sociology at Bowdoin College, who testified that sidewalks were not a satisfactory alternative location for parades.  He testified, inter alia, that street marches attract more attention as they are more likely to inconvenience the general public by interrupting traffic and disrupting routines.  He further testified that street

marches also have positive connotations because of the American tradition of successful protest marches, such as the 1963 March on Washington. By contrast, he thought, sidewalk marches have less symbolic significance and provide logistical challenges because sidewalks are narrower and prevent the carrying of large banners.

The district court also expressed concern that Augusta's parade ordinance arguably requires the securing of permits for sidewalk marches as well as for street marches, despite the City's insistence that permits were not needed for sidewalk marches. The language of the ordinance refers to the "use of public ways within the city," which could, the district court said, easily be construed to include sidewalks.

ii. Analysis

We disagree with the district court's conclusion, and that of our dissenting colleague, Judge Lipez, that sidewalk marches and other alternatives to street marches are so lacking as to necessitate an indigency exception to the parade permit fee. We also find no reason to reject the City's insistence that sidewalk parades do not require permits under Augusta's parade ordinance. In a case not unlike the present, the Sixth Circuit similarly concluded that an indigency exemption or waiver was not required for a parade ordinance where, as here, the sidewalks and parks of the city were available without charge for related speech activities. Stonewall, 931 F.2d at 1137. The Sixth Circuit

-54-

stated, "Because we believe the availability of the sidewalks and parks provides a constitutionally acceptable alternative for indigent paraders, we find that the lack of an indigency exception does not render the ordinance constitutionally invalid." Id. We agree with that analysis and find the situation in Augusta analogous. Plaintiffs have cited several circuit and district court cases in support of their contrary position, but these, of course, are not binding upon us and are, moreover, largely distinguishable.[15]

---

[15]The district court cited Cent. Florida Nuclear Freeze Campaign v. Walsh, 774 F.2d 1515, 1523-24 (11th Cir. 1985), which held a city ordinance unconstitutional in part because there was no provision exempting indigents from paying the cost for police protection, but that case also found that "alternative means of exercising First Amendment rights" were not available, which is not the case here. Invisible Empire of the Knights of the Ku Klux Klan v. Town of Thurmont, 700 F. Supp. 281, 286 (D. Md. 1988), which found that the requirement of reimbursing the town for police protection and cleanup was unconstitutional because it was not "waived or modified for indigents" relied on Walsh for its holding. Both cases were decided before Forsyth, which emphasized that a license fee that was more than "nominal" was not inherently unconstitutional. 505 U.S. at 136-7. Wilson ex rel U.S. Nationalist Party v. Castle, 1993 WL 276959 at *4 (E.D. Pa. July 15, 1993), holding that an insurance requirement was not narrowly tailored as applied to persons "who are financially and otherwise unable to obtain coverage," involved an insurance requirement, which implicates issues of viewpoint discrimination as an insurance company may charge more depending on the group being covered, and a strict scrutiny analysis not applicable here. Likewise, in Invisible Empire Knights of the Ku Klux Klan v. City of West Haven, 600 F. Supp. 1427, 1435 (D. Conn. 1985), holding a bond requirement unconstitutional as applied to those who could demonstrate their inability to obtain a bond, the case involved the potential of a viewpoint discriminatory "heckler's veto" in the application for a bond and thus implicates issues not at play here. Plaintiffs additionally rely on E. Conn. Citizens Action Group, 723 F.2d at 1056-57, which was also decided before Forsyth and held that the

## 1. Ample Alternatives

Augusta argues that it provides numerous alternative avenues of communication to persons unable to afford a parade permit, including (a) use of sidewalks, (b) gatherings on state land such as the statehouse steps (Augusta is the state capital), (c) hand-held banners or signs, (d) leafleting, (e) vehicular processions, and (f) mass outdoor gatherings of fewer than 200 people. None of these alternatives requires payment of a fee, and only one -- a rally on the state house steps -- requires a permit, which is freely obtained.

Although the district court acknowledged the alternatives offered by the City, it believed the sidewalks -- an alternative

---

defendant government agency could not charge an administrative fee for the sole purpose of deterring frivolous requests but rather could charge the fee only to the extent it could demonstrate "its necessity as a means of offsetting expenses associated with processing applications for access to property under its control." Likewise, the plaintiffs' reliance on Lubin v. Panish, 415 U.S. 709, 718 (1974) is inapplicable here where the Court found that "in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay." The plaintiffs here have alternate means of expressing their views in the city of Augusta. The case perhaps most helpful to the plaintiffs is Van Arnam v. GSA, 332 F. Supp. 2d 376, 406 (D. Mass. 2004), where the district court, relying on several of the above cases, held unconstitutional an indemnification/hold harmless requirement on the grounds that the absence of an indigency waiver suppressed more speech than was necessary and thus was not narrowly tailored. 332 F. Supp. 2d at 406. The analysis did not thus turn on the availability of alternative means of expression (which the district court had found were available). To the extent that the two cases are comparable, we disagree with the narrow tailoring conclusion in Van Arnam.

especially emphasized -- were insufficient because they are too narrow and marginal as compared with main streets, thereby perhaps dampening the number of protestors able to march and the amount of attention attracted. But while a sidewalk march might, for these and other reasons, seem less appealing to some protestors than a street march, it nonetheless provides a prominent route along major thoroughfares for dissemination of a message. As Gregoire stated in his affidavit, several groups have used sidewalk marches to engage in expressive activities, indicating the availability of the sidewalk alternative and its appeal to some persons.

Further, as in Stonewall, the availability of gathering places for protests, here including especially the state house steps, with its potential for media coverage, demonstrates the ample range of speech alternatives in the City. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate," Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) (citation omitted), but an ordinance does not fail for lack of adequate alternatives so long as there are avenues for "the general dissemination of a message." Frisby, 487 U.S. at 483-84 (ban on picketing in public forum upheld where alternatives included entering neighborhoods alone or in groups, going door-to-

-57-

door, distributing literature through the mails, or contacting residents by telephone).

This Circuit has upheld in other contexts alternative means of communication despite diminution in the quantity of speech, a ban on a preferred method of communication, and a reduction in the potential audience. Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 192-94 (1st Cir. 1996) (holding that a ban on newspaper boxes in historic district met the intermediate scrutiny test in that it was narrowly tailored and newspapers had ample alternative channels of communication in the same area); see also D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999) ("The essence of this question is not 'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" (quoting Nat'l Amusements, 43 F.3d 731, 745 (1st Cir. 1995)). In upholding a ban on newspaper boxes in the historic Beacon Hill neighborhood of Boston, we concluded, "The First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property." Globe Newspaper Co., 100 F.3d at 193.

The plaintiffs have access to numerous speech alternatives, making a fee waiver to march in the streets unnecessary. Before ending the inquiry, however, we address the

district court's reference to the possibility that sidewalks might themselves be subject to a parade permit requirement.

## 2. Free Availability of Sidewalks

The district court's conclusion that sidewalk marches "at least arguably" may be subject to permitting (and thus subject to attendant fees) is not unreasonable based simply on the language of the ordinance, but it contradicts the overwhelming evidence in the record that Augusta does not interpret, and has not interpreted, its own parade ordinance in this manner. Gregoire testified in his March 2004 affidavit that sidewalk marches are free and require no permit. In his 2005 supplemental affidavit, he said he had informed Sullivan of that fact in anticipation of the planned March 2004 protest and offered to assist his group with a free sidewalk march prior to the start of the instant litigation. Though certain other of Gregoire's proffers of limiting constructions regarding other provisions of the parade ordinance, supra, came too late or were too vague to be considered authoritative interpretations, his interpretation of the sidewalk marches is one apparently followed by the City from before the litigation. Gregoire's supplemental affidavit in 2005 listed seven permit-fee and fee-free sidewalk marches which had taken place in the previous year, indicating a well-established practice of allowing sidewalk marches without requiring a permit or a fee. We accordingly disagree with the district court's suggestion that sidewalk marches might be excluded

as genuine alternatives for persons unable to afford a permit to march on city streets.

It is obviously not simple to select out those people and causes whose indigency is such as to warrant giving them, as it were, a free pass. Such provisions for indigency exceptions do exist in the ordinances of some cities, e.g., Pittsburgh, Minneapolis, and Los Angeles. Whether a particular city, like Augusta, wishes to enact and deal with the administration of such an exception is up to it and its government. Our conclusion is simply that there are sufficient alternatives for speech as not to require, constitutionally, that Augusta provide an indigency exception here.

In all events, the Supreme Court has addressed the question of parade permit fees in some detail in Forsyth. It has not suggested that an indigency exception is constitutionally required. If one is to be created under the aegis of the First Amendment, surely that is for the Supreme Court to decide in the first instance. There is a vast number of areas in which a lack of funds may disadvantage an individual, and a constitutional determination that in civil matters an indigent need not pay costs ordinarily imposed on others is a matter to be approached with some caution.

e.  Abstention and Saving Constructions

The district court observed that it did not take lightly its conclusion that the ordinances at issue here are unconstitutional.  It dismissed the possibility of abstention or certification to the state court, however, because the resolution is not "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question."  Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 575-76 (1989).  A district court's abstention ruling is reviewed on appeal for abuse of discretion.  Sheerbonnet, Ltd. v. American Express Bank, 17 F.3d 46, 48 (2d Cir. 1994).  The court did not abuse its discretion here in declining to abstain or certify any of the issues to the state court.

## D.  Conclusion

We **affirm** the district court's determination that sections 13-5(a), to the extent that it requires thirty days' advance notice, and 13-5(c), to the extent that it requires a permit applicant to meet with the Police Chief, are unconstitutional; and **reverse** the district court's invalidation (for grant of excessive discretion) of 13-5(e), the fee provision. We **affirm**, however, the district court's holding that the $478.55 fee overcharge to Sullivan was unconstitutional.  We **reverse** the district court's determination that plaintiffs had standing to challenge the MOGO and that the absence of an indigency requirement

-61-

in section 13-5(e) is unconstitutional.  We **<u>vacate</u>** the district court's rulings that provisions of the MOGO are unconstitutional. Each side shall bear its own costs.


**- Dissenting Opinion Follows -**

**LIPEZ, <u>Circuit Judge</u>, dissenting in part.** I agree with Judge Campbell's excellent opinion in all but one respect. Because there is a world of difference between marching down the main street of a city and being confined to a sidewalk or park to communicate one's message, I do not agree that the City's parade ordinance complies with the First Amendment without an indigency exception. All citizens, not only those who can afford the cost of traffic control, have a right to express their views on matters of public concern in the most powerful of our nation's traditional public fora. <u>See</u> <u>Murdock</u> v. <u>Pennsylvania</u>, 319 U.S. 105, 111 (1943) ("Freedom of speech . . . [is] available to all, not merely to those who can pay their own way."). Therefore, I respectfully dissent from that portion of the majority opinion allowing Augusta to impose parade permit fees without regard to an applicant's ability to pay.

**I.**

**A. Fundamental Rights and Indigents**

The right to free speech embodied in the First Amendment is a fundamental constitutional guarantee, and access to public spaces to speak on matters of public concern has long been a concomitant privilege of the right of expression. The Supreme Court has recognized that use of the streets and other public places has

> from ancient times, been a part of the
> privileges, immunities, rights, and liberties

-63-

> of citizens. . . . [S]treets and parks . . .
> have immemorially been held in trust for the
> use of the public and, time out of mind, have
> been used for purposes of assembly,
> communicating thoughts between citizens, and
> discussing public questions.

Haque v. CIO, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.);

see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group

of Boston, 515 U.S. 557, 579 (1995) ("Having availed itself of the

public thoroughfares 'for purposes of assembly [and] communicating

thoughts between citizens,' the [petitioner] is engaged in a use of

the streets that has 'from ancient times, been a part of the

privileges, immunities, rights, and liberties of citizens.'")

(quoting Haque, 307 U.S. at 515); Perry Educ. Ass'n v. Perry Local

Educators' Ass'n, 460 U.S. 37, 45 (1983) (noting that streets and

parks are "[a]t one end of the spectrum" among "places which by

long tradition or by government fiat have been devoted to assembly

and debate").

In this case, plaintiffs claim that their access to the

"public streets, the quintessential traditional public fora," Int'l

Soc. for Krishna Consciousness v. Lee, 505 U.S. 672, 676 (1992)

(citation omitted), may not be denied based on their inability to

pay the required fees.  In many contexts, disparities attributable

to wealth are not of constitutional significance.  See Kadrmas v.

Dickinson Pub. Schs., 487 U.S. 450, 458 (1988) ("We have previously

rejected the suggestion that statutes having different effects on

the wealthy and the poor should on that account alone be subjected

to strict equal protection scrutiny."). Nevertheless, in multiple settings involving fundamental rights, the Supreme Court has held that it is unconstitutional to deny access to indigents. See, e.g., M.L.B. v. S.L.J., 519 U.S. 102, 114-16, 123-24 & n.14 (1996) (striking down Mississippi statute conditioning appeal of order terminating parental rights on advance payment of court fees and noting that "fee requirements ordinarily are examined only for rationality" but that exceptions have been made under equal protection principles when a "fundamental interest [is] at stake"); Lubin v. Panish, 415 U.S. 709, 718 (1974) ("[I]n the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay."); Boddie v. Connecticut, 401 U.S. 371, 374 (1971) (relying on due process principles to hold that the State may not deny a divorce to a couple based on inability to pay court costs); Griffin v. Illinois, 351 U.S. 12, 17-19 (1956) (relying on due process and equal protection principles to invalidate a state requirement that a defendant pay for a trial transcript as a prerequisite to appeal and holding that an indigent defendant has an equal right of access to appellate review of a conviction where a State generally affords such review); cf. Kadrmas, 487 U.S. at 465 (rejecting plaintiffs' claimed entitlement to free school bus transportation because "the

statute challenged in this case discriminates against no suspect class and interferes with no fundamental right").

In concluding that some degree of public subsidy is necessary in these contexts, the Court relied on equal protection or due process principles, or both,[16] and applied heightened review because of the fundamental interests at stake. See M.L.B., 519 U.S. at 115-16 (noting that, "[a]bsent a fundamental interest or classification attracting heightened scrutiny, . . . the applicable equal protection standard 'is that of rational justification'") (quoting Ortwein v. Schwab, 410 U.S. 656, 660 (1973) (per curiam)). Under such heightened review, "the State's need for revenue to offset costs" was insufficient justification for denying equal access to individuals of limited economic means. See M.L.B., 519 U.S. at 123.

The Court's discussion in M.L.B. sheds light on the nature of the rights triggering heightened scrutiny of government fees. There, the respondents had asserted that prior case law established that the government "'need not provide funds so that people can exercise even fundamental rights'" and argued that a

_____

[16] The dual rationale arises in the judicial access cases, where the due process concern relates to the "essential fairness of the state-ordered proceedings anterior to adverse state action" and the equal protection concern "relates to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs." M.L.B., 519 U.S. at 120. However, Justice Ginsburg noted in M.L.B. that most of the decisions used an equal protection framework. Id.

subsidy for the M.L.B. parent would conflict with cases "recognizing that the Constitution 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" 519 U.S. at 124-25 (citation omitted).[17] In response, the Supreme Court distinguished the cited cases as involving efforts to obtain "state aid to subsidize their privately initiated action or to alleviate the consequences of differences in economic circumstances that existed apart from state action." Id. at 125.

The plaintiffs here neither claim entitlement to benefits the state has made available in limited circumstances – such as tax breaks or Medicaid funding – nor otherwise invoke an "affirmative right" to governmental assistance to meet personal needs or private concerns. To the contrary, they invoke an explicit constitutional right to speak in a forum that the government holds in trust for just such a purpose. Their claim to this forum implicates core First Amendment values. The plaintiffs sought to speak on matters of public concern relating to national and international affairs.

---

[17] Among the cases cited were Regan v. Taxation with Representation of Wash., 461 U.S. 540 (1983), which rejected a nonprofit organization's claims, on First Amendment and equal protection grounds, that they were entitled to receive tax deductible contributions to support their lobbying activity, and Harris v. McRae, 448 U.S. 297 (1980), which held that women seeking medically necessary abortions were not entitled to Medicaid funding.

"[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection," Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982); Carey v. Brown, 447 U.S. 455, 467 (1980)). The First Amendment's explicit right "peaceably to assemble" lends further weight to their interest in a public gathering to address common concerns. See, e.g., Cox v. New Hampshire, 312 U.S. 569, 574 (1941) (noting that regulation of use of the streets implicates "the right of assembly and the opportunities for the communication of thought and the discussion of public questions").

Moreover, public speech is not a self-centered pursuit; it is speech for "the public." Any assumption that the speaker is the primary beneficiary when he uses a public forum is incorrect:

> This assumption ignores the benefit of the speaker's activities for the entire society. His activities are part of the process by which a democratic society makes informed decisions. He speaks so that society can listen and decide for itself.

David Goldberger, A Reconsideration of Cox v. New Hampshire: Can Demonstrators Be Required to Pay the Costs of Using America's Public Forums?, 62 Tex. L. Rev. 403, 413 (1983) (hereinafter "Goldberger"). An individual who seeks a permit to disseminate a message about matters of public concern in a traditional public forum is thus exerting free speech rights that not only are

explicitly promised by the Constitution but also are of value to the community as a whole.  Where such communal benefits exist, the government's countervailing interest in recouping costs solely from the individual is weaker.

First Amendment rights are not absolute, however, and indigency does not alter that principle.  As the majority explains, the government may impose reasonable time, place and manner restrictions on the exercise of First Amendment rights, "provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication  of the information.'"  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)); see also City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) ("[A] restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."); Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 186 (1st Cir. 1996).  I therefore must consider whether the fee requirement in the parade ordinance satisfies this three-part inquiry.

The first prong is easily met here.  It is undisputed that Augusta's parade ordinance is content neutral.  On its face, the ordinance also is narrowly tailored to serve the government's

recognized interest in recovering the costs of administration, traffic-control and clean-up associated with parades held on public streets. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 136 (1992) ("[R]aising revenue for police services . . . undoubtedly is an important government responsibility . . . ."); Cox, 312 U.S. at 576 (approving fees limited to administrative expenses and "'to the maintenance of public order in the matter licensed'") (quoting state court's construction of the challenged statute). As discussed above, however, such fees are subject to heightened review in the context of First Amendment rights. See M.L.B., 519 U.S. at 115-16; Casey v. City of Newport, 308 F.3d 106, 110-11 (1st Cir. 2002). They cannot survive such scrutiny if individuals unable to pay the fees would be denied an adequate public forum for speaking on issues of public importance – the concern addressed by prong three of the time, place and manner inquiry.

Plaintiffs' claim that they are constitutionally entitled to a fee waiver thus turns on whether the City offers an adequate alternative to a street march for disseminating a message that concerns a public issue.[18] As I shall explain, I share the district court's view that the options proffered by the City fall short of

---

[18] My analysis considers only speech on matters of public concern, the type of expression for which the plaintiffs in this case sought parade permits.

the constitutional standard.  See Sullivan v. City of Augusta, 406 F. Supp. 2d 92, 126 (D. Me. 2005).[19]

## B. The Adequacy of the Available Alternatives

In finding that Augusta offered plaintiffs no adequate alternatives to a street march, the district court concluded that the parade ordinance arguably embraced sidewalks as well as streets.  I agree with the majority that the ordinance should not be read in that manner.  The City's past practice sufficiently demonstrates that the ordinance does not extend to sidewalks and that sidewalks are thus an available free alternative to the streets, along with parks and the Statehouse steps.  The question thus becomes whether streets provide such a unique forum for the communication of views that other public fora, including sidewalks, cannot be deemed adequate alternatives.

That assessment necessarily requires an examination of the speaker's objectives – both in terms of the message she wishes to communicate and the audience she seeks to reach.  Still, the

---

[19] The majority opinion notes that, despite the Supreme Court's consideration of parade permits in some detail in Forsyth, the Court did not there "suggest[] that an indigency exception is constitutionally required."  The indigency issue was not before the Court in Forsyth.  The Court granted certiorari in Forsyth "to resolve a conflict among the Courts of Appeals concerning the constitutionality of charging a fee for a speaker in a public forum."  505 U.S. at 129.  The five justices in the Forsyth majority bypassed the question of the permissible size of a fee, concluding that the challenged ordinance was invalid because it lacked procedural safeguards and tied the fee to the content of speech.  Id. at 137.

match between the desired forum and a substitute need not be perfect: "'[T]he lens of inquiry must focus not on whether a degree of curtailment exists, but on whether the remaining communicative avenues are adequate.'" Globe Newspaper, 100 F.3d at 193 (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 745 (1st Cir. 1995)).

In assessing adequacy, we have been particularly sensitive to the ability of a party to disseminate its message to the same general audience despite the restrictions at issue. In Globe Newspaper, we considered the validity of a ban on newsracks in the Beacon Hill Historical District of Boston. 100 F.3d at 178. We noted that the regulation did not prevent the plaintiff newspapers from selling their publications in the District by means of street vendors, thereby accomplishing their objective "in the very public forum – the District's sidewalks – from which the newsracks are banned." 100 F.3d at 193.

The Supreme Court reached a similar conclusion in City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789 (1984), which involved a challenge to an ordinance banning all posted signs, including political campaign posters, in the City of Los Angeles. The Court found that the ban did "not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs . . . is prohibited." Id. at 812. Similarly, in National

Amusements, we upheld a town bylaw prohibiting the showing of movies between 1 a.m. and 6 a.m. despite the appellant's assertion that the regulation "foreclose[d] the opportunity to communicate its message to a distinct segment of the movie-going public" – those who would attend only a midnight showing. 43 F.3d at 745. Although we acknowledged that the bylaw would "diminish[] the total quantity of appellant's speech in some measure, and simultaneously curtail[] its opportunity to communicate" with patrons who preferred midnight shows, we concluded that "thwarting such an idiosyncratic preference cannot be equated with a denial of adequate avenues of communication." Id. In each of these cases, while some potential recipients of the message may have been missed, the message could still reach the intended audience.

In this case, plaintiff Sullivan sought a parade permit in February 2004 on behalf of a group known as the March for Truth Coalition, which advocates the "worldwide end of war and empire-building" as well as social and economic reform. Plaintiff Dansinger sought a permit to hold a peace march and rally in conjunction with the Million Worker March to be held in Washington, D.C., in October 2004.[20] Both proposed parades were thus aimed at

_____

[20] Plaintiffs' Statement of Material Facts reported that Sullivan sought to participate in the march "as a way of expressing his opposition to the war in Iraq and as a way of publicly advocating the need for affordable health care, veterans' rights and benefits, and living wage jobs, and as a way of associating himself publicly with individuals and groups who share his views." According to the Statement, Dansinger sought to march "as a way of

shaping public attitudes about matters of public policy – the type of political speech that long has been associated with street marches.

Of the available free alternatives, it is easy to conclude that parks and similar fixed sites where speakers may congregate are not adequate alternative locations for achieving the objectives of street marches. A stationary gathering whose message will be delivered to only the finite group of non-participants who also happen to be in that spot or travel by it is considerably different from a march that inevitably will come into contact with waves of outsiders. A march down Main Street will display the message to pedestrians, business owners, customers, and even motorists who encounter the periphery of the procession while being re-routed. Although television and newspaper coverage could enlarge the audience for a stationary protest, that possibility depends on the editorial judgments of the media, and any message actually disseminated would be both limited in scope and lacking the immediacy of personal contact. If plaintiffs' objective had been to demand that state legislators take particular action on pending legislation, the City's assertion that the Statehouse steps were an adequate alternative would have more force. Plaintiffs,

expressing his opposition to the war in Iraq, supporting the Million Worker march and publicly advocating the need for economic justice in America, and to associate with others to advocate effectively for those goals."

-74-

however, sought to persuade as many members of the public as they could reach to join their efforts to advocate for changes in public policy.

In finding that the City could not constitutionally "block indigents from using the public streets to convey their message," the district court relied on the opinion of plaintiffs' expert, Joe H. Bandy, III, a sociology professor at Bowdoin College with a special expertise in the study of social movements. See Sullivan, 406 F. Supp. 2d at 124-25. Professor Bandy confirmed the superiority of "moving speech" for communicating a political message:

> With a march that moves through public streets, the demonstrators can bring their protest message to a variety of different audiences, audiences that are not a part of the activists' direct constituency but the broader public. . . . [B]y protesting through a format that moves through different public spaces, a march is more likely to gain the attention of the media and political leaders than if the demonstration were localized in one area that did not inconvenience the general public in some way.

Bandy Declaration, 1/20/05, at 3, App. at 111.

While large gatherings in public places can sometimes attract similar attention, the force of a message conveyed by the more typical small protest group will be much greater if the group is marching down the city's main thoroughfares, displacing other people's daily routines, than if it is confined to a park or the Statehouse steps. See Gary Wiseman, Note, Paying for Free Speech:

-75-

The Continuing Validity of Cox v. New Hampshire, 64 Wash. U.L.Q. 985, 988 n.16 (1986) (hereinafter "Wiseman") ("In the absence of spectators, even the most exciting demonstration lacks force."). Therefore, when a speaker seeks to motivate the general public about a matter of public policy, the opportunity to communicate from a fixed location will rarely be an adequate substitute for a march down city streets.

Sidewalks, however, present a closer question. Like the street march, a sidewalk march provides access to a constantly changing audience that will likely include many of the same individuals who would observe a procession moving down the middle of the street. Although the City notes that a sidewalk procession would be viewed by more motorists than a street march because the streets would be open and cars would be able to travel directly past the procession, that theoretical advantage is illusory. Such motorists will of necessity be focused on traffic conditions and will be unable to give other than incidental attention to the parade.[21]

Moreover, it is not only the size of the crowd on the sidelines that affects the message being conveyed. If a march is

---

[21] Mass marches alongside well traveled roads also have a long history and can have dramatic communicative effect. See, e.g., Williams v. Wallace, 240 F. Supp. 100, 104-05, 107-08 (D.C. Ala. 1965) (describing disrupted Selma-to-Montgomery voting rights march on March 7, 1965, and proposal for a subsequent march later that month).

confined to the sidewalks, the perception that space is limited, and that fewer marchers can therefore be accommodated, will reduce the number of participants. The district court reasonably accepted appellees' assertion that safety concerns "may deter some would-be participants" from joining a sidewalk march because of the need to cross traffic and the lesser police presence. Sullivan, 406 F. Supp. 2d at 125. Indeed, such concerns are likely to suppress the number of spectators as well, with shoppers and others altering their routes to avoid the sidewalk congestion. The resulting reduction in the number of marchers, as well as spectators, dilutes the message that is delivered:

> [B]y reducing the number of participants or spectators, a speaker forfeits other advantages of size. A mass demonstration "conveys an image of power to bystanders and participants alike, reinforces the group's commitment to its cause, . . . and appears to circumvent the elite's power to control mass communication."

Wiseman, 64 Wash. U.L.Q. at 988 n.16 (quoting Stanley Ingber, The Marketplace of Ideas: A Legitimizing Myth, 1984 Duke L.J. 1, 41 n.7); see also Eric Neisser, Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas, 74 Geo. L.J. 257, 297 (1985) (hereinafter "Neisser") ("[T]hose who hold unpopular, unknown, or unrepresented views can express the strength of their position (when allowed in the public marketplace of ideas) only through their numbers.").

Street marches have the distinct advantage of allowing more participants to march side-by-side, giving the demonstration – and its message – a more commanding presence. Professor Bandy observed that the narrowness of sidewalks can affect both the logistics of a march and the strength of the message: "[A]s a matter of logistics, having a large number of people file in a very narrow pathway would make a more snake-like procession rather than a mass rally procession. This narrowing of the demonstration would likely dampen the message because the demonstration would not look as large to passers by or the media." See Bandy Declaration at 5, App. at 113.

The large signs and banners we have come to expect as part of a parade cannot be displayed across the narrower width of a sidewalk, and the logistical difficulty of carrying such oversized messages front-to-back along the edge of the sidewalk undoubtedly would discourage their use. No matter how long the procession, a small band of protesters carrying small signs simply does not communicate the same dramatic image of massive support as a crowd walking six or eight abreast carrying street-wide signs. Thus, excluding speakers from the streets does not simply relocate their message. The strength of the message is measurably

diminished by the perception that it lacks support from the "masses." See Bandy Declaration at 5, App. at 113.[22]

While the numbers – both real and perceived – are important, they are not the only relevant factor. The tradition of a parade as a public event means that a street march commands our attention in a way that a sidewalk procession does not. As a community, we look forward to parades, we are attentive to them, and we interrupt our everyday lives to accommodate them. A parade is a significant community event – whether its purpose is to recognize Irish heritage on St. Patrick's Day, to celebrate a sports championship, or to express gratitude to soldiers on Veterans Day. A marcher confined to the sidewalk is thus denied the public forum that we historically have used to express our collective sentiment. See Timothy Zick, Space, Place, and Speech: The Expressive Topography, 74 Geo. Wash. L. Rev. 439, 460 (2006) (hereinafter "Zick") ("In terms of communicative behavior, place is as critical to expressive experience as voice, sight, and auditory function.").

Moreover, in recent decades, streets have acquired powerful symbolism as a forum for protest and political expression. The images of 1960s civil rights activists marching through the

_____

[22] From a case-specific perspective, the sidewalk option here was particularly limiting. Deputy Police Chief Gregoire stated in his deposition that the sidewalks along the appellees' proposed parade route had room for two, perhaps three, people of average size to walk side-by-side.

streets remain vivid, and those marches continue to inspire the current generation of street protests on matters of global importance – including racial injustice, war and peace, and the inattentiveness of a community to its poor. See, e.g., Iraq Vets Lead Syracuse March, People's Weekly World, Oct. 11, 2007 (describing September 2007 march through streets of Syracuse, N.Y., by more than 2,500 peace activists, including members of Fort Drum chapter of Iraq Veterans Against the War); Rallies Support Jena Teens, San Jose Mercury News, Sept. 21, 2007 (from New York Times news service) (describing a "slow-moving march that filled streets, spilled onto sidewalks and stretched for miles," with more than 10,000 demonstrators, protesting the treatment of six black Louisiana teenagers arrested in the beating of a white classmate); Janitors to March for Pay Increases, San Mateo County Times, June 14, 2007 (describing planned street march by "[t]housands of Silicon Valley janitors" from East Palo Alto to "the heart of Palo Alto's affluent downtown" as part of International Justice for Janitors Day); Demonstrators to Turn Out for Immigration Reform, Denver Rocky Mountain News, May 1, 2007 (reporting that "Denver and other cities across the nation will host another round of marches today to demonstrate that the campaign for immigration reform is still under way"). Indeed, "taking it to the streets" is itself part of the activist message, i.e., that ordinary people have the power to take over the public way in their pursuit of social

change.  See Zick, 74 Geo. Wash. L. Rev. at 471 ("Parades, protests, and demonstrations are . . . akin to temporary appropriations of the streets.  They express specific social and political messages and give public voice to sentiments about existing power relations.").

Sidewalk protests, by contrast, are commonly associated with more particularized dissent.  A sidewalk demonstration is often linked to a specific business or institution, focusing attention on what is occurring at that moment at that place – targeting, for example, a business that refuses to serve or hire members of minority groups, an abortion clinic, or an employer engaged in a labor dispute.

There are exceptions, of course. As the City points out, the civil rights movement used sidewalk marches on multiple occasions during the 1960s. The successful Selma-to-Montgomery voting rights march along Highway 80 in late March 1965 could not have been more powerful if the thousands of marchers had been walking down the middle of the road.  Although such marches had enormous impact during an extraordinary time in our country's history, when equal rights demonstrators had widespread support and the world's attention, the fact remains that a sidewalk march is usually an inadequate substitute for the streets when the message to be disseminated is unrelated to a specific locale.

The stakes in access to the free public forum have also become higher as other methods for reaching mass audiences have grown more expensive and out of reach for the average citizen.

> [A]ll speakers cannot gain access to all forums. For example, many speakers cannot afford television or radio broadcasting time, and speakers espousing unconventional views may find the mass media unreceptive. For this reason, public streets and parks, which are accessible to speakers regardless of their financial resources or media appeal, are vitally important public forums. Maintaining free access to public streets and parks helps insure a market composed of a wide range of competing ideas.

Wiseman, 64 Wash. U. L. Q. at 986 (footnotes omitted); see also Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1036 (9th Cir. 2006) ("As traditional public fora, parks, sidewalks, and streets 'provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards.' Those fora must not be regulated too restrictively, lest they become unavailable to those who have little or no recourse to other, often costly, areas for public discourse.") (citation omitted)); Bandy Declaration at 7, App. at 115 ("[S]ocial movements have none or very few alternative methods to communicate their message other than low-cost demonstrations in public spaces and streets."); Neisser, 74 Geo. L.J. at 297.[23]

---

[23] Professor Neisser also noted the importance of ensuring free public fora:

> The first amendment may not mandate or even tolerate affirmative government action to overcome the disparities

Although the internet has provided new fora for communicating with large numbers of people, websites, blogs and other publicly accessible online opportunities are not substitutes for the face-to-face experiences that have, "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." See Menotti v. Seattle, 409 F.3d 1113, 1174 (9th Cir. 2005) (Paez, J., concurring in part and dissenting in part) ("'[T]here is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person . . . .' Public protests are at the heart of the First Amendment and are critical for incubating civic engagement and encouraging spirited debate." (quoting Hodgkins v. Peterson, 355 F.3d 1048, 1063 (7th Cir. 2004)); Thomas P. Crocker, Displacing Dissent: The Role of 'Place' in First Amendment Jurisprudence, 75 Fordham L. Rev. 2587, 2590 (2007) ("[T]he Internet does not provide for serendipitous occasions to encounter others face-to-face or to discover the new or the strange in both a social and public

---

in communicative effectiveness wrought by the marketplace's pricing structure and the differing financial resources of competing groups. Yet, if the first amendment is to assure a safety valve for dissatisfaction, genuine discussion of public policy, ascertainment of new scientific truths or cultural forms, and individual self-development, the public system of expression must, at a minimum, avoid replicating the private market's price structure and thereby reinforcing its inequities.

74 Geo. L. J. at 297 (footnotes omitted).

setting."); Zick, 74 Geo. Wash. L. Rev. at 484 ("There is no question that an abundance of speech takes place in these new places; but courts must recognize that this speech is qualitatively and, quite often, quantitatively different from speech in real places."). The streets thus remain the only publicly accessible forum that offers speakers both the immediacy of personal contact and – in contrast to sidewalks – the realistic potential for attracting a large audience and widespread attention with a powerful message undiluted by space constraints.

To be sure, the Constitution does not guarantee every speaker her forum of choice. See, e.g., Heffron v. Int'l Soc. for Krishna Consciousness, 452 U.S. 640, 647 (1981) ("It is [] common ground . . . that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). As noted earlier, an alternative need not have precisely the same impact to be "ample," see Taxpayers for Vincent, 466 U.S. at 812; Globe Newspaper, 100 F.3d at 193. However, under any meaningful standard of heightened review, that alternative forum cannot be ample if it lacks the qualities that make the streets a uniquely powerful forum for expression, and thereby leaves indigent speakers and the public they seek to influence with a substantially different and diminished First Amendment experience. In upholding the sign ordinance in Taxpayers for Vincent, the Court concluded that there was "no reason to

believe" the expressive benefits of posting signs on public property could not be obtained through other means. 466 U.S. at 812. Noting the absence of a traditional right of public access to utility poles for purposes of communication "comparable to that recognized for public streets and parks," id. at 814, the Court observed:

> Notwithstanding appellees' general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression.

Id. at 812.

Here, by contrast, we are considering access to "'[t]raditional public forum property,'" which "'occupies a special position in terms of First Amendment protection,'" id. at 813 (quoting United States v. Grace, 461 U.S. 171, 180 (1983)). And, as I have described, the communication difference between the streets and sidewalks is substantial, despite their physical proximity. A speaker whose march may proceed down the middle of Main Street has numerous advantages – larger numbers of spectators and participants, the space to accommodate bolder and bigger signs, the focused attention drawn by a parade, and the symbolic power of "taking it to the streets."

This case implicates what Taxpayers for Vincent did not: "a uniquely valuable or important mode of communication," 466 U.S. at 812, that has "immemorially been held in trust for the use of the public," Hague, 307 U.S. at 515. Because a message communicated in the streets is uniquely powerful, a speaker in Augusta who is unable to pay the permit fee to hold a street march has no adequate alternative. That fee barrier is particularly unacceptable given the government's role as trustee for the public in providing safe access for expressive and other uses of the streets. See Cox, 312 U.S. at 574. Consequently, the Constitution requires that the city's parade ordinance include an indigency exception.

## II.

The City maintains that providing a fee exception for indigents would be virtually impossible to administer. Without minimizing the challenges of designing and implementing such a system, there is experience to the contrary. Other cities have included indigency waiver provisions in their schemes, and have adopted various approaches for determining eligibility. In Pittsburgh, for example, a sponsor of a parade or other expressive event protected by the First Amendment will not be charged the application fee or any other costs – including for traffic control – upon a showing of indigency. To establish indigency, the event sponsor must submit a notarized affidavit certifying that:

(1) The costs to be imposed exceed the available resources of the sponsor/organization and the sponsor/organization does not reasonably foresee such funds becoming available within a reasonable period after the Event; and

(2) The sponsor is not charging participation fees or other admittance fees to the general public for the Special Event and has no other sponsor that is underwriting costs.

Pittsburgh, Pa., Code of Ordinances § 470.06(d)(1), (2).[24] The Minneapolis ordinance sets a $25 parade permit fee and also requires applicants – without expense to the city – to

(1) . . . provide either authorized civilian or police personnel at all intersections requiring traffic-control personnel.

(2) . . . provide volunteers to monitor the barricades at all intersections not requiring traffic-control personnel, as determined by the department of public works and the police department.

(3) . . . provide, install and remove the barricades, signs and delineation equipment as directed by either the director of public works or the chief of police or their designees.

---

[24] Pittsburgh's application fee for "First Amendment Activity" is set at an amount that "reflects the cost of evaluation and scheduling the event." § 470.04. The city also requires payment of "cost recovery fees" for the cost of providing public safety and public works services. § 470.06. The total for the application and cost recovery fees for parades may not exceed specified amounts that vary depending on the parade's timing and duration. For example, the maximum charge for a weekday parade lasting no more than two hours is $500 while the maximum is $3,000 for a parade on a weekend or city holiday that lasts more than two hours. § 470.04. However, the city assumes the first $750 of "all costs associated with First Amendment Activity, Parades, community events and block parties." § 470.06(d). Costs for city services that exceed $750 are split equally between the City and the Special Event sponsor, with parades being subject to the maximum fees stated in § 470.04. Id.

> (4) . . . defend and hold the city harmless
> from all claims, demands, actions or causes of
> action, of whatsoever nature or character,
> arising out of or by reason of the conduct of
> the activity authorized by such permit,
> including attorney fees and expenses.

Minneapolis, Minn., Code of Ordinances § 447.120. However, the city provides an indigency exception "[f]or individuals and organizations with limited financial means" if "such burdens substantially threaten the ability of such individuals and organizations to obtain a parade permit." § 447.150. The director of public works may waive the parade requirements under the following circumstances:

> (1) *All parade applications*. The parade
> applicant and each person responsible for
> organizing the parade must certify that each:
> (1) receives public assistance, or (2)
> receives average family income which is less
> than one hundred twenty-five (125) percent of
> the federal poverty line, or (3) cannot
> support his or her family and his or herself
> and also satisfy the requirements of section
> 447.120 without substantial hardship. . . .
> (2) *Parade applicants for organizations*. In
> addition, if the proposed parade is to be
> conducted for, on behalf of, or by an
> organization, the applicant shall disclose
> assets held in the name of such organization.
> The parade applicant must certify to the best
> of his or her knowledge that the mission,
> operation, or existence of the organization
> will be substantially threatened if the
> requirements of section 447.120 must be
> satisfied by the organization.

Id.

There are undoubtedly threshold difficulties in these systems of deciding who, in fact, qualifies for the fee exemptions.

-88-

A determination that fees "exceed the available resources of the sponsor/organization," or that the "existence of the organization will be substantially threatened" if it is required to pay a parade fee involves subjective judgments about allocation of limited resources. Does a nonprofit need to forego mailing this month's newsletter so the cost of postage can be reallocated to parade expenses? Does it need to reassign parade participants who otherwise would be carrying placards to traffic control duties? See Goldberger, 62 Tex. L. Rev. at 410-11 (noting that "Cox provides no standards for determining what constitutes an oppressive charge" and that the Court did "not indicate whether a charge that might deplete ten percent, twenty-five percent, or fifty percent of a speaker's treasury is excessive or whether such a charge is tolerable"); see Bandy Declaration at 7, App. at 115 ("[T]here have been cases where fees imposed on movements for poor people and the homeless in order to hold public demonstrations had the effect of substantially straining the resources of those organizations because they rely heavily upon volunteer organizers and have no offices or regular sources of income.").

These sorts of questions, however, speak to the problems inherent in charging anyone for the exercise of First Amendment rights in streets and other public ways. Even those for whom a parade fee is affordable may be deterred by the prospect of paying several thousand dollars to finance their message. Indeed, the

fees deemed permissible – for traffic control, for example – are for "the same services [] routinely provided without charge to nonspeech users of streets, sidewalks, and parks," thereby "devalu[ing] speech activities in comparison to nonspeech activities." Id. 411; see also Neisser, 74 Geo. L.J. at 332 ("[P]olice service fees inherently discriminate against planned public gatherings for expressive purposes, which the first amendment is designed to protect.").

Hence, there is a plausible policy argument that the responsibility for financing First Amendment activities in public fora should belong to the community at large. At a minimum, a government subsidy is a First Amendment imperative when individuals who lack the means to pay required fees seek access to a uniquely powerful public forum for the purpose of speaking on a matter of public concern.

The costs need not be prohibitive for local governments, nor necessarily borne by a single entity. As the likely target of protestors with statewide concerns, a city that serves as the state capital – like Augusta – reasonably could look to state coffers to help finance street marches drawing residents from throughout the state. See Neisser, 74 Geo. L.J. at 340-42. Alternatively, allowing indigent applicants to provide their own traffic monitors – perhaps with prior training provided by the police department –

could help reduce the cost of monitoring parades.[25]  Other approaches for balancing the government's interest in recouping costs and the speaker's right of access to the streets also seem viable: applicants for permits who lack resources may be able to meet city fee requirements through on-the-scene fund raising if offered the opportunity to pay after their event, or perhaps shorter routes or time periods could be designated for such marches, so long as the speaker's message is not improperly compromised.  Creative government officials could devise additional solutions that meet constitutional requirements.

### III.

When fundamental interests are at stake, the Supreme Court has held repeatedly that the government may not deny equal access to indigents based solely on their inability to pay required fees. The right to march in the streets to disseminate a message of public concern is at the core of the First Amendment and could not be more fundamental.  Thus, a parade ordinance that conditions access to the streets on ability to pay cannot withstand the heightened scrutiny applicable to such limitations because, for the reasons I have explained, the streets are a uniquely powerful forum for reaching a wide audience to express views on public policy.  No speaker may be denied access for such expression in that forum

---

[25] Professor Neisser reported that such an approach was adopted by the City of Palo Alto, California.  See Neisser, 74 Geo. L.J. at 339 n.387.

based on an inability to pay the associated costs.  The district court held correctly that "the Parade Ordinance must afford a fee waiver for those unable to pay."  406 F. Supp. 2d at 126.  I respectfully dissent from the majority's contrary conclusion.